## MANUFACTURING COMPANY. v. BRADLEY.

1. A corporation organized under the laws of South Carolina agreed, by an instrument under its seal, to pay on a certain date to A. a sum of money at a specified rate of interest, and by an indorsement under its seal (*infra*, p. 177), on the paper after it matured, further agreed, in consideration of forbearance to a date named, to pay at a higher rate of interest the money to *bearer*. *Held*, 1. That the indorsement is a new contract upon sufficient consideration, and is negotiable within the meaning of the law merchant, and by the law of that State. 2. That B., the lawful holder thereof, is not precluded from suing thereon in the Circuit Court, by the fact that A. is a citizen of that State.

2. Where the paper by its terms creates a lien for the debt therein mentioned, the stockholders also being by law jointly and severally liable therefor, and their property subject to seizure upon an execution against the company, — *Held*, that, to a suit in equity seeking a decree for the debt, and the enforcement of B.'s lien, the stockholders are proper parties defendant.

3. The fact that after the paper had matured the president of the company bought it and transferred it by delivery to B. furnishes no defence to a recovery, the purchase having been made in good faith with his own means, and sanctioned by the directors of the company.

APPEAL from the Circuit Court of the United States for the District of South Carolina.

The facts are stated in the opinion of the court.

*Mr. A. G. Magrath* and *Mr. Samuel Lord, Jr.*, for the appellants.

*Mr. William. E. Earle* and *Mr. James B. Campbell* for the appellee.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

The Marine and River Phosphate Mining and Manufacturing Company, one of the appellants, is a corporation organized under the General Statutes of South Carolina, on March 15, 1870, with a subscribed capital of $500,000, the amount limited by the articles of association, of which but one-half had actually been paid in. On Dec. 28, 1872, it borrowed from William J. Gayer, receiver, appointed by the Court of Common Pleas for the County of Charleston, in a cause pending therein, of Dabney, Morgan, & Co. against The Bank of the State of South Carolina, $20,000 of the funds in his hands, which he was authorized so to invest. As evidence of, and security for,

the loan it executed and delivered its bond, of which the following is a copy : —

" STATE OF SOUTH CAROLINA,  } 
   CHARLESTON COUNTY.    }

"Know all men by these presents, that we, the Marine and River Phosphate Mining and Manufacturing Company of South Carolina, are held and firmly bound unto William J. Gayer, receiver, in the sum of twenty thousand dollars, with interest thereon at the rate of ten per cent annually, payable semi-annually, to be paid on the first day of July next ensuing the date hereof, for which payment well and truly to be made we, the said company, do hereby bind ourselves and our successors firmly by these presents.

"In witness whereof the said company have caused their seal to be hereunto affixed, the twenty-eighth day of December, A. D. 1872.

"We, the said company, do further covenant and agree that the above bond constitutes a lien upon the property of the said company, and that the same is issued under and pursuant to the provisions of section thirty-nine of chapter sixty-four of the General Statutes."

It is signed by " D. T. Corbin, president Marine and River Phosphate Mining and Manufacturing Company of South Carolina," countersigned by " Reuben Tomlinson, treasurer," and sealed with the corporate seal.

Subsequently to the maturity of this bond, C. C. Puffer, who had become successor in the receivership to Gayer, on April 2, 1874, transferred and delivered it to D. T. Corbin, in exchange for three hundred shares of the capital stock in the Phosphate Company, owned by him. This transaction was reported by the receiver to the court as a payment of the note, and the shares of stock were carried as part of the fund in his hands, and were afterwards sold by order of the court. No express order of the court is produced authorizing the transaction, but his accounts disclosing it were passed and confirmed and he was discharged. Corbin at this time was still president of the company. The bond, while held by the original receiver, had been duly recorded in the office of the register for mesne conveyances, as a lien upon the company's property.

On May 13, 1874, an indorsement was made upon the bond, as follows : —

"In consideration of further forbearance on the part of the holder of this bond till the first day of January, A. D. 1875, the Marine and River Phosphate Mining and Manufacturing Company of South Carolina hereby promises, waiving all set-off or other defence, to pay this bond to bearer on the first day of January, A. D. 1875, with interest at the rate of twelve per cent per annum, from the first day of April, 1874, payable quarterly; and should said bond not be paid on the first day of January next, then thereafter interest shall be paid in the same manner and at the same rate as herein mentioned, till paid."

This indorsement was signed "The Marine and River Phosphate Mining and Manufacturing Company of South Carolina, by D. T. Corbin, president," and countersigned by "Reuben Tomlinson, treasurer." The corporate seal was thereto affixed.

The evidence on the point does not permit any doubt that this arrangement between Corbin and the company was made with the full knowledge and express sanction of the directors. The treasurer testifies that he objected to taking action upon the proposal of Corbin for an extension of payment as contained in the indorsement, without first submitting the question to them. The form of the renewal was the one agreed to by them, and by them ordered to be indorsed on the bond. This was done with knowledge that Corbin then held it. The interest to be paid appears to be lawful and customary, being then the rate charged by banks. It was regularly paid by the treasurer to Corbin, and in December, 1876, a payment of $10,000 was made to him by the treasurer on account of the principal. That payment was reported to the board of directors, some of whom had been consulted in regard to it by the treasurer before it was made; because, as he states, "the funds on hand at the time having been provided for other purposes, I did not feel at liberty to use them for that purpose without first consulting with such directors as were conveniently at hand." He adds : "Mr. Corbin frequently, during the months of January and February, 1877, requested me to arrange for the payment of the balance of $10,000 principal, and the inter-

est due on said bond. The matter was brought to the attention of the directors by me, and no objection was made by them to the payment of said money, if it could be raised without serious embarrassment to the company. Arrangements to pay said bond were finally made and the money actually raised and deposited in bank for that purpose, subject, however, to conditions, the fulfilment of which was prevented by the change in the organization of the company which took place in March, 1877."

In June, 1877, Corbin transferred and delivered the bond to Bradley, the appellee, in consideration of ten dollars paid, and his agreement to pay the amount still due on the face of it, less the ten dollars paid, as stated in a letter from Corbin to Bradley, making the offer which was accepted, " only when you shall have collected the amount from the company, and what you shall collect from the company, less the cost and expenses of collection."

In answer to a question, on cross-examination, as to his motive and purpose in parting with the bonds in this way, Mr. Corbin said, " that the company had refused to pay the bond, and I believed if I held the bond I would be compelled to litigate the same with the company, and I believed if it passed into the hands of a third person, in good faith, that the company would pay it to him without a long and tedious litigation, having no prejudices against him, as I believed; and further, I did not wish to be a party plaintiff in an important suit against the company that I had been so long connected with as president."

On July 5, 1877, Bradley, being a citizen of Massachusetts, filed his bill in equity in the court below against The Marine and River Phosphate Mining and Manufacturing Company, and several others, alleged to be citizens of South Carolina, and stockholders in that corporation. It alleges that the bond is a lien upon all the property of the corporation, embracing certain described personal property, and the franchise granted to it by the State to dig, mine, and remove from the bed of the navigable streams and waters within the jurisdiction of the State the phosphate rock and deposits, according to an act passed March 1, 1870. It also alleges that the defendants

charged to be stockholders in the corporation have not fully paid up the amount of the capital subscribed by them, and that they are within the provisions of section 23 of chapter 64 of the General Statutes of South Carolina, under which act the corporation was organized, which provides that "the members of every company shall be jointly and severally liable for all debts and contracts made by the company until the whole amount of capital stock fixed and limited by the company in manner aforesaid is paid in, and a certificate thereof made and recorded as prescribed by the following section."

The bill contains the following averment: "That to bring a separate and distinct action at law against each of such stockholders would be a great hardship to your orator, inasmuch as a court of equity has full power to hear and adjudicate all the issues between your orator and the said several defendants, thus preventing a multiplicity of suits; and by ascertaining the number of shares of the capital stock of the said Marine and River Mining and Manufacturing Company of South Carolina, held by the said several defendants, the amount of the subscription paid upon each of said shares, and the amount still due and unpaid thereupon, can adjust and decree the amount which each of said defendants justly owes to your orator, and can afford him that relief which a court of law is unable to give."

The prayer of the bill is that the defendant, The Marine and River Phosphate Mining and Manufacturing Company of South Carolina, be decreed to pay the amount due upon the bond, with interest; that the same be declared to be a lien upon its property described in the bill, and that the same be sold for the payment and satisfaction thereof; and that the other defendants be decreed to be justly and severally liable for the amount of the said debt, and to pay on account thereof so much of the unpaid subscription of each share of the stock in said corporation, held by them severally, as shall be necessary to pay the same, and for general relief.

A final decree was rendered against the company and several of its stockholders, co-defendants, for the payment of the amount due on account of the said bond, for which execution was awarded, and a decree foreclosing the equity of

redemption in the corporate property described in the bill, on which the bond is declared to be a lien, and directing its sale.

To review this decree the defendants below prosecute the present appeal.

Several questions, arising upon the pleadings and evidence, and embodying the errors assigned upon the decree, will be considered in their order.

I. The first of these relates to the jurisdiction of the court.

It is objected in the first place that the complainant is the assignee of a chose in action on which no suit could have been maintained in the Circuit Court by his assignor, and that consequently he is within the prohibition of the first section of the act of March 3, 1875, c. 137. The answer to this objection is, that the obligation sued on is a negotiable promissory note, and is, therefore, excepted out of the prohibition relied on. It is true that the bond, as originally executed, was payable to Gayer, receiver, simply, and was not negotiable; but the subsequent indorsement was a new and complete contract, upon a distinct and sufficient consideration, and being payable to bearer, is negotiable by delivery merely. It is a negotiable note within the meaning of the law merchant, and according to the law of the place of the contract, notwithstanding it is an instrument under seal. *Langston* v. *South Carolina Railroad Co.*, 2 S. C. 248; *Bank* v. *Railroad Company*, 5 id. 156; *Bond Debt Cases*, 12 id. 200, 250.

It is further objected, however, that the transaction between Corbin and Bradley was fictitious and not real; that the title to the bond remained in the former, so that the latter, not being the real party in interest, cannot maintain an action to enforce it; that the present suit is collusive, for the purpose of conferring jurisdiction upon the Circuit Court, and, therefore, within the rule declared in *Smith* v. *Kernochen* (7 How. 198), *Jones* v. *League* (18 id. 76), and *Barney* v. *Baltimore City* (6 Wall. 280), and enacted by the fifth section of that act, as construed in *Williams* v. *Nottawa*, 104 U. S. 209.

The delivery of the bond by Corbin to Bradley, under the arrangement we have mentioned, was, however, a transfer of the legal title to the obligation. Whether the agreement was not also a transfer by Corbin of all beneficial interest in the bond,

depends on whether Bradley was bound to account to him specifically for the net proceeds of its collection, or only to pay him so much money as they should amount to, — a question which it is not necessary to decide; because it does not appear from this record but that Corbin could himself have maintained a suit in his own name in the Circuit Court upon the bond. It is nowhere distinctly alleged or shown that at the time this suit was brought he was a citizen of South Carolina. That he was so at the time of the original transaction may be presumed or inferred from the circumstances; but to confer or oust jurisdiction, when that depends on citizenship, the necessary facts must be distinctly alleged and admitted or proved. Upon the present state of the record, the assumption could not have been made in his favor to sustain the jurisdiction if he were seeking as a citizen of South Carolina to prosecute a suit; and equally it will not be made to defeat the jurisdiction, which otherwise is rightly invoked by the complainant.

It is further objected that the jurisdiction in equity cannot be sustained, because the complainant had a complete and adequate remedy at law, so far, at least, as relief is sought against the stockholders individually upon their statutory liability.

That liability is a joint and several personal obligation of all the members of the company, unlimited except by the amount of the debts and contracts of the corporation, to which it extends. It is unconditional, original, and immediate, not dependent on the insufficiency of corporate assets, and not collateral to that of the corporation, upon the event of its insolvency. It is, in one aspect, a suretyship for the corporation, for by sect. 37 of the act any stockholder paying a debt of the company for which he is personally liable is entitled to an action against it for indemnity, in which he may take the corporate assets, but is without recourse upon the property of any other stockholder.

The jurisdiction in equity, then, cannot rest upon the administration of a trust fund, as in cases where delinquent stockholders are charged with the obligation to make good their subscriptions to unpaid capital stock, or in those where a constitutional or statutory liability is imposed beyond the

amount of the subscription, to a fixed sum, but on each in proportion to his share in the capital stock. There the necessity of enforcing a trust, marshalling assets, and equalizing contributions, constitutes a clear ground of equity jurisdiction.

The statute under consideration prescribes no form of action, and the jurisdiction may be regarded as concurrent, both at law and in equity, according to the nature of the relief made necessary by the circumstances upon which the right arises. The thirty-fifth section of the act expressly authorizes separate actions at law against the company and against its officers, in cases where, by the statute, the latter are made personally liable for defined delinquencies; while the thirty-sixth section provides that the property of stockholders, in cases where they are liable, may be taken on attachment or execution issued against the company. In the present case there was an acknowledged jurisdiction to grant equitable relief, by enforcing the lien of the bond upon the corporate property, and as incident to that to make a decree against the corporation for the payment of the debt. Having jurisdiction for that purpose, it is entirely consistent with its principles and practice for a court of equity to extend it, so as to avoid a multiplicity of suits, and to give to the plaintiff a single and complete remedy. As the individual stockholder is bound by the judgment against the corporation, it is equitable that he should be present as a party, that he may have the opportunity to defend for himself; and in case of payment out of his property he is entitled to be subrogated to the right of the creditor against the company, in order to indemnify himself out of the corporate assets. On these grounds, we think, the jurisdiction in equity is well supported.

II. The remaining grounds of defence have been, in effect, anticipated in the statement of the case. They are without merit or substance.

The title of the complainant to the bond sued on cannot be assailed for want of authority in the receiver to transfer it; even if such a defence was open to the obligors, for it sufficiently appears that the transaction, if not previously authorized, was subsequently confirmed by the court.

Nor does the relation between Corbin and the company at the time of the transaction furnish any defence, either at law

or in equity. The relation undoubtedly was one of a confidential and fiduciary character, but there seems to be no ground in the evidence to challenge the good faith with which the business was conducted. The bond of the company was purchased from the receiver with his own means, and not those of the company; the value paid, so far as the testimony discloses, was full; and every step, when taken, was made known and assented to by the directors of the corporation. The transaction was legitimate in itself and beneficial to the company, and the dealing was not by the president with himself, but with the corporation, in fact, represented and acting by other directors, with full knowledge of all the facts.

A defence of payment was suggested by the circumstance that the receiver, after parting with the bond in exchange for the stock, reported it as paid in that way. So far as the fund in his hands was concerned, it might be so treated; but the company and its stockholders must be conscious that they have no right so to consider it.

We find no error in the decree, and it is accordingly

*Affirmed.*