## GOLDIE v. COX.

### No. 12004.

Circuit Court of Appeals, Eighth Circuit.

Sept. 8, 1942.

See, also, 8 Cir., 130 F.2d 721.

Seth Lundquist, of Minneapolis, Minn. (D. J. Shama, of Minneapolis, Minn., on the brief), for appellant.

Benedict Deinard, of Minneapolis, Minn. (Oscar A. Brecke, of Minneapolis, Minn., on the brief), for appellee.

Before STONE, WOODROUGH, and JOHNSEN, Circuit Judges.

STONE, Circuit Judge.

Appellant filed two amended general claims (Nos. 184 and 185) in the bankruptcy proceeding of the Calhoun Beach Club Holding Company. After full hearing, the referee denied both entirely. On review, the trial court affirmed the referee except as to one item in claim No. 184, being for $8,000.00 based on eight $1,000.00 bonds issued by bankrupt and pledged by Mr. Goldie as collateral to a note purchased by C. R. Shefveland. From this order of affirmance, Mr. Goldie appeals. Three corporations will be, for brevity, referred to as follows: The Calhoun Beach Club Holding Company as the bankrupt, the Calhoun Beach Holding Company as the Holding Company, and the Calhoun Beach Club as the Club.

Claim No. 184 is for claimed advancements to the bankrupt and is evidenced by 183 checks, from October 19, 1926, to July 17, 1933. These checks are in various sums and amount to $20,378.48 plus interest thereon. Claim No. 185 was for claimed advancements to the bankrupt represented by 32 notes, dated from November 20, 1926, to November 15, 1928, in a total of $20,212.84 plus interest thereon.

The report of the referee states: "In view of the fact that the books of the bankrupt are reasonably complete for the period up to December 31, 1928, and there are no books thereafter, the court for convenience will consider these claims in two periods:

A. The period from October 9, 1926 to December 31, 1928.

B. The period after January 1, 1929.

A. The first period includes all of the 32 items of claim No. 185, aggregating $20,-212.84, and the first 37 items of claim No. 184, aggregating $15,140.49, as they are listed on tabulations introduced in evidence as Goldie Claim 185 Exh. 1, and Goldie Claim 184, Exh. A., or a total of $35,353.-33. All of the items of claim No. 185 are reflected on the journal and ledger of the bankrupt; of the 37 items of claim No. 184, all except items 1, 2, 4 to 9, 17 to 19, 28, 31 and 36, are credited to Goldie on the ledger.

B. The second period includes items 38 to 183 of claim No. 184, aggregating $4859.-51. None of these items are reflected on the books of the bankrupt produced."

As to Period A, the referee concluded, from showing of the account books of the bankrupt, that Mr. Goldie was entitled to a credit, as "shown on the ledger account," for net amount of advances to December 31, 1928, of $25,637.84; and must be charged with a debit, "shown on the ledger account," of $25,525.08—leaving a net credit due him of $156.76. This disposed of all the items on claim No. 185 and of items 1 to 37 on claim No. 184. This left items 38 to 183 of claim 184, which fell in the above period B.[1]

---

[1] Concerning the account books of the bankrupt, the referee found as follows.

"In September 1929 Malmberg resigned as secretary-treasurer of the bankrupt and Goldie became his successor. At said time Malmberg turned over to Goldie all of the corporate books and records of the bankrupt in his possession including the minute book. In October 1929, Malmberg left the City of Minneapolis; thereafter, his office turned over to Goldie all files in connection therewith; at least since said time and until the bankruptcy herein Goldie had the actual custody and control of all of the records of the bankrupt. After the appointment of Harold W. Cox as Trustee herein, which appointment was made on April 28, 1933, and on August 15, 1933, Goldie delivered to the Trustee certain books and records of the bankrupt, including [he] accounts payable ledger and a journal for the year 1929. The Trustee thereafter delivered these books and records to Mr. Brecke, one of his counsel, who retained possession thereof until the fall

As to Period B, there were the above 146 items (38 to 183) which amounted to $4859.51. The referee found that the claimant "has failed to establish by any satisfactory evidence that said payments were made at the request of the bankrupt, or for its use or benefit, and has failed to produce any account books reflecting such payments and has failed to disclose any payments which he may have received from the bankrupt during that period or any charges against him during that period.

Goldie, being the president and managing officer of the bankrupt, occupied a fiduciary relation to it, and any claim presented by him against the bankrupt estate must be subjected to close and rigid scrutiny, and to be allowed, must be satisfactorily established by the proof. Such serious doubt exists as to the propriety of any of said items that the court feels constrained to disallow them."

In addition to the above claims for advancements, there was an item of $300.00 for "services", at $20.00 per day for 15 days between July 18, 1932, and October 12, 1932. As to such, the referee found that no evidence was offered to support this item; and, "in addition", that payment of salaries to any officer or director, except from "net profits arising from the operations of said Club property under said operating agreement" was a condition for issuance of a license (by the Securities Commission of Minnesota) to sell stock of the bankrupt and a written waiver to that effect and for that purpose was executed by claimant and there had never been any such "net profits."

The net result of the above findings of the referee is that there was due claimant $156.76 on claim 184 and nothing on claim 185. These findings were based up-

on what we may designate as the mathematical phase of the problem, that is, what the referee deemed the evidence to show as to the existence of advancements by and as to opposing debit items against the claimant—in short, whether the bankrupt was in fact indebted to claimant, and, if so, in what amount. However, the findings of the referee did not stop with these mathematics.

He considered other issues and found: that all advancements in these claims should be treated as capital contributions to the bankrupt and not as loans to be repaid; that any amount due on these claims should be subordinated to the claims (27 claims for $29,500.00) of holders of bonds which were personally guaranteed by Mr. Goldie; that this claimant joined with others in false and fraudulent transactions "with an intent to enforce groundless claims and thereby deceive and defraud stockholders and creditors of the above estate" to their damage and, therefore "is now estopped from asserting any claim against the above estate, and from attempting to share with the good faith creditors of the above estate in the distribution thereof."; that an assignment of the subject matter of these claims to L. M. Shapiro (or to a partnership made up of him and his brother Sam Shapiro) was ineffective because the debt for which the assignment was made had been paid; and, that an item in claim 184 for $8,000.00, represented by bonds of the bankrupt pledged as collateral to a note owned by C. R. Shefveland, was not allowable.[2]

In his certificate, the referee stated the questions presented for review were:

"(1) Whether said unsecured claims, if allowed in any amount, should be postponed and subordinated to the rights of

of 1935, at which time Goldie took all of said books and records for the purpose of preparing his amended claims, and ever since said time Goldie has retained possession thereof. Upon this hearing Goldie produced the journal and ledger of the bankrupt, which contained entries of its business or of its financial transactions up to December 31, 1928. Said ledger was received in evidence as Goldie Claim 185, Exhibit 3, and said journal was received in evidence as Goldie Claim 185, Exhibit 4. Certain other fragmentary records were also produced by Goldie (Trustee's Exh. G, and Goldie Claim 185, G. 2) but no further books reflecting any of the bankrupt's financial transactions

subsequent to the year 1928 were produced although the Trustee repeatedly demanded their production, specifically production of the Minute Book, Stock-Certificate Book, Ledger for 1929, checkbooks and journal for 1929. It appears that the minute book of the bankrupt corporation was never delivered to the Trustee, and that the Trustee and his said attorneys have never had possession thereof."

[2] We have not been able to identify this bond item of the detailed schedule (Exh. A in appeal No. 12,001) but the referee and the parties seem to treat it as being part of the claim. The matter is, however, not important on this appeal since

creditors holding 'A' Bonds of the bankrupt guaranteed by Goldie.

"(2) Whether Goldie was guilty of actual bad faith and breach of duty whereby the good faith creditors of the above estate were deceived, whereby he is now estopped from asserting any claims against the above estate.

"(3) Whether the bankrupt was in fact indebted to Goldie, and if so in what amount.

"(4) Whether the advances made by Goldie for the bankrupt should be treated as capital contributions to the bankrupt or as loans.

"(5) Whether Goldie performed any services for the bankrupt in 1932 for which he is entitled to compensation.

"(6) Whether C. R. Shefveland, as subrogee of Goldie, is entitled to the allowance of a claim upon $8,000 of 'B' bonds of the bankrupt included in Goldie's claim No. 184.

"(7) Whether in the event Goldie has a claim, L. M. Shapiro, or Hennepin Transfer Company or Hennepin Transportation Company, Inc., is the assignee thereof."

The certificate states the evidence as to each of these seriatim.

We take up now the particular matters urged here by appellant. Logically, we consider first those points which, if determined against appellant, would completely or largely dispose of the claims in their entirety. There are three points of this character: (1) this point concerns the finding that claimant was guilty of actual bad faith and breach of duty whereby good faith creditors were deceived and because of which he is estopped from asserting any claims against the estate—if this be determined adversely to claimant, both claims fail entirely; (2) this point concerns the finding that the advancements should be treated as capital contributions and not as loans—if this be determined adversely to appellant, all items therefor in the claims fail but the claim item for services is not concluded thereby; (3) this point is concerned with the claim item for services.

### (1) The Fraud Point.

This point hinges on the existence or not of bad faith or breach of duty by claimant to the prejudice of creditors and stockholders of the bankrupt. By such bad faith or breach of duty is meant such conduct as would make it inequitable for claimant to have his claims allowed or, if allowed, to have them share, in distribution of the estate, on equality with other unsecured creditor claims. Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281. Determination here required consideration of certain legal principles and then the application of those principles to the fact situation.

The legal principles are stated by Mr. Justice Douglas in Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281. Those principles are: that disallowance or subordination of a claim is determined "in light of equitable considerations" (308 U.S. page 305, 60 S.Ct. page 244); that this applies to claims by an officer, director or stockholder of a bankrupt corporation (308 U.S. pages 306, 307, 60 S.Ct. 238, 84 L.Ed. 281); that, because such officer or director is a fiduciary, their dealings with the bankrupt "are subjected to rigorous scrutiny" and the burden is on them "not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein"—the test being "whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain" (308 U.S. page 306, 60 S.Ct. page 245); that it is the duty of the bankruptcy court "to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate" and this duty "is especially clear when the claim seeking allowance accrues to the benefit of an officer, director, or stockholder" (308 U.S. page 308, 60 S.Ct. page 246); that "a sufficient consideration may be simply the violation of rules of fair play and good conscience by the claimant; a breach of the fiduciary standards of conduct which he owes the corporation, its stockholders and creditors." (308 U.S. pages 310, 311, 60 S.Ct. page 247).[3] Therefore, the ques-

---

the trial court allowed this item and no attack upon that action appears here. Therefore, that question is no longer in the case.

In claim 184, there is an item (No. 10) for $1,500.00, which claimant concedes here was mistakenly included and not allowable.

[3] Appellant cites Crowder v. Allen-West Commission Co., 213 F. 177, this Court, which states the more restrictive rule that "a creditor must have been guilty

tion here is whether this claimant has so violated the "rules of fair play and good conscience" that his claims either should be disallowed or should be subordinated to the unsecured creditor claims.

The fact situation found by the referee to justify disallowance of these claims on this basis is, as stated by the referee, set forth in the footnote 4.[4]

To the statements in the footnote may be added the undisputed facts that, prior to the applications to the Securities Commis- sion, a number of memberships in the Club had been procured. Also, that sale of stock

---

of some moral turpitude or some breach of duty by which other creditors were deceived, to their damage, to constitute such a fraud as will estop him from shar- ing with them in the distribution of the proceeds of the estate of his debtor in bankruptcy. A willful intent to deceive or such gross negligence as is tantamount thereto is an essential element of such an estoppel". 213 F. page 184. It is not necessary for us to determine here wheth- er Pepper v. Litton is to the contrary or whether it limits this doctrine of the Crowder case. Much of the rule stated above from Pepper v. Litton has special reference to the fiduciary situation of a creditor who is an officer, director, or stockholder of a bankrupt corporation. In the Crowder case, it appears and is expressly stated (213 F. page 184) that the claimant there was simply a creditor and not a fiduciary.

Appellant cites also Bird & Sons Sales Corporation v. Tobin, 78 F.2d 371, 100 A.L.R. 654, this Court. That case is of interest here merely that it distinguishes (78 F.2d page 374) the Crowder case from the one there before it.

In this connection, attention may be called to a statement in Geist v. Pru- dence Realization Corporation, 2 Cir., 122 F.2d 503 (decided since and citing Pepper v. Litton), at page 505, as fol- lows:

"Similarly, Bankruptcy Act, § 65, sub. a, 11 U.S.C.A. § 105, sub. a, requires, in liquidation, the distribution of 'dividends of an equal per centum' 'on all allowed claims, except such as have priority or are secured.' Moore v. Bay, 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed. 133, 76 A.L.R. 1198; Globe Bank & Trust Co. v. Martin, 236 U.S. 288, 305, 35 S.Ct. 377, 59 L.Ed. 583; Sampsell v. Imperial Paper & Color Corp. [313 U.S. 215], 61 S.Ct. 904, 907, 85 L.Ed. 1293. The only departures made from the ordinary rule of equality are based on some very definite equity, such as fraud, Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281, mis- management of the debtor by a parent corporation, Taylor v. Standard Gas & Electric Co., 306 U.S. 307 [618], 59 S. Ct. 543, 83 L.Ed. 669, or concealment of a claim to the prejudice of another creditor, In re Bowman Hardware & Electric Co., 7 Cir., 67 F.2d 792. In the absence of such an equity, subordination is not a function of the bankruptcy court. Crowder v. Allen-West Commission Co., 8 Cir., 213 F. 177, 184; Sampsell v. Im- perial Paper & Color Corp., supra; cf. Moise v. Scheibel, 8 Cir., 245 F. 546."

However it may be as to ordinary creditor claimants, we doubt if the rigid limitations in this quotation are to be placed upon the general rule announced in Pepper v. Litton as applicable to claimants who have a fiduciary relation of officer, director, or stockholder in a bankrupt corporation.

4 This statement of the referee is divid- ed into two parts. The first is a his- torical account which is applicable gen- erally to consideration of the claims but which must be understood to grasp the full meaning of the fact situation par- ticularly applicable to this present is- sue. The second recited this particular fact situation. The historical statement is as follows:

"The history of the bankrupt corpora- tion appears fully from the files and rec- ords herein. The facts essential to a determination of the claims now consid- ered are these:

"Three associated corporations were involved in the Calhoun Beach Club en- terprise:

"1. The Calhoun Beach Club Holding Company, Inc., a Delaware corporation, hereinafter for brevity called the 'bank- rupt';

"2. The Calhoun Beach Holding Com- pany, a Minnesota corporation, herein- after for brevity called 'Holding Compa- ny';

"3. Calhoun Beach Club, a non-profit Minnesota corporation, hereinafter for brevity called the 'Club'.

"Goldie at all times prior to the bank- ruptcy was the managing officer and di- recting head of the bankrupt and the Holding Company and the moving spirit and dominating character in the enter- prise. He was the majority stockholder of the bankrupt; his associates and co- stockholders in the bankrupt were Ernest Malmberg, an attorney of Minneapolis, and Harry G. Foote, then of Minneap- olis. His associates and co-stockholders in the Holding Company were one J. R. Mendelsohn and Leonard I. Sutterman of Chicago, Illinois.

"In 1926 the Holding Company was the registered fee owner of the premises

was limited, in the order of the Commission, to Club members.

The findings of the referee on this quoted fact situation is thus stated by the referee:

"Each and all of the aforesaid instruments and transactions whereby the Holding Company purported to create, preserve and enforce [tile], lien and claims against the bankrupt and its property and estate were false and fraudulent, and were falsely and fraudulently caused to be done and executed by Goldie and his associates, with an

located at Dean Boulevard and West Lake Street in Minneapolis, Minnesota, upon which the Club Building was later built. In the fall of 1926, Goldie organized the bankrupt to construct and maintain the Calhoun Beach Club and Apartment building for the exclusive use of the members of the Club, which was also organized at about the same time. For that purpose the bankrupt undertook to purchase this property from the Holding Company, and to construct the building and operate the same under an agreement with the Club. The arrangement between the bankrupt and the Club is recorded in a written agreement between them dated as of March 11, 1927 which was received in evidence as Trustee's Exhibit 'N'. Said agreement recites that the bankrupt owns an agreement to purchase said property and intends to erect a building for hotel and club purposes and to equip the same at an estimated cost, including the price of the land, of approximately one million dollars, for the exclusive use of Club members and their guests; in said agreement, the bankrupt agreed to carry out the terms of payment in said agreement of purchase, and as soon as possible after there was turned over to it from the Club out of membership dues collected by the Club the sum of $255,000, or a less sum if agreed upon, and arrangement by the bankrupt for sufficient additional funds, to erect and furnish such building, and to maintain and operate the same for the use of Club members and their guests; and the Club assigned to the bankrupt all of the returns from present or future Club memberships, including all fees and charges, and agreed that the bankrupt should receive all income derived from the maintenance and operation of the building and its facilities. Said agreement as later modified by inclusion of an arbitration provision required by the conditional order of registration of the Securities Commission, and dated August 7, 1928, was received in evidence as Trustee's Exh. S.

"Pursuant to the plan recorded in said operating agreement the Club engaged the bankrupt to conduct a membership campaign for it for a commission of 15% of the membership fees; upon the specific understanding that the bankrupt might employ others to carry on the campaign at its expense, neither the bankrupt nor its employees to have any claim on the [Clug] for services or expenses in connection with the campaign in excess of the 15% commission; and the bankrupt was authorized to withhold 15% of the membership fees and was required to trustee the balance with the Minnesota Loan and Trust Company of Minneapolis. This campaign promotion agreement is embodied in Trustee's Exhibit 'L'.

"Coincidentally [woth] the execution of Trustee's Exhibit 'L' the bankrupt entered into an agreement with Goldie whereby it in turn employed Goldie to conduct said campaign and agreed to pay Goldie the stipulated 15% commission, and authorized him to withhold said commission and required him to trustee the balance with said Trust Company; in turn, on the specific understanding that [Gildie] might employ other persons to carry on the campaign at his own expense, neither Goldie nor his employee to have any claim on the bankrupt for services or expenses in connection with the campaign in excess of the 15% commission. This agreement between the bankrupt and Goldie is embodied in Trustee's Exhibit 'J'.

"At the same time the bankrupt and the Club entered into a trust agreement with the Minnesota Loan and Trust Co. for the protection of the prospective Club members, which required the bankrupt to deposit 85% of all membership fees with the Trust Company, there to remain until the trust fund should total $255,000, on the specific agreement that the bankrupt could use no more than 15% of the fees for the expense of conducting the membership campaign and should make no charge beyond the 15% commission, and with provision that after expiration of 6 months, in the event that the sum of $255,000 was not then raised, the Trustee should, upon joint demand of the bankrupt and the Club, turn over all the trusteed funds to the Club. Said agreement is embodied in contract of December 11, 1926 contained in Trustee's Exhibit 'I'.

"II. From November 1926 until February 14, 1927 the parties to said agreements operated thereunder. In February 1927 Goldie represented to his associates that it was not possible for him to conduct the membership campaign upon the basis of a 15% commission. There-

intent to enforce groundless claims and thereby deceive and defraud stockholders and creditors of the above estate, and constituted a deliberate deception and fraudulent scheme by Goldie, and Goldie was guilty of actual moral turpitude and breach of duty by which the good faith creditors of the above estate were deceived and defrauded to their damage, whereby Goldie is now estopped from asserting any claim against the above estate, and from attempting to share with the good faith creditors of the above estate in the distribution thereof.

upon said agreements between the Club and the bankrupt, and between the bankrupt and Goldie, and between the bankrupt and the Club and the Minnesota Loan and Trust Company, were amended to enlarge the commission from 15 to 20 percent, and to reduce the trusteed funds from 85 to 80% as to membership fees upon applications received after February 14, 1927. Said agreements of modification are embodied in Trustee's Exhibits 'M', and 'K', and contract of February 14, 1927 contained in Trustee's Exhibit 'I'.

"Said membership campaign was conducted pursuant to said agreements of modification, after February 14, 1927 and until the events hereinafter found, except that in the sum [summer] of 1927, the Trustee, on the demand of the bankrupt and the Club turned over the trusteed fund to the Club and the trust agreement terminated, and the Club turned over the fund to the bankrupt.

"III. About August 1, 1927 the bankrupt began the construction of a club and apartment building upon the premises. From the beginning of the work until the summer of 1928 the Fleisher Engineering & Construction Company acted as general contractor, and Magney and Tusler acted as architect for the owner. During that period the bankrupt completed the excavation, the piling, and a portion of the foundation.

"In 1928 the bankrupt negotiated with H. O. Stone & Company of Chicago, Illinois, to secure a mortgage loan on the premises, for the purpose of financing the completion of the building. On August 10, 1928 an application for this loan was accepted by H. O. Stone & Company. At that time Goldie was the general manager of the bankrupt and in fact arranged for and negotiated the mortgage loan. The mortgage loan was for the sum of $1,075,000 secured by bonds of the bankrupt and a trust deed or mortgage on the property; of the bonds, $825,000 were designated as First Mortgage 'A' bonds, and $250,000 were designated as Subordinated or General Mortgage 'B' bonds. In the loan application the bankrupt agreed that principal and interest of the first $250,000 of the 'A' bonds to become due should be guaranteed by Goldie and his associates, Foote and Malmberg. The loan applica-

tion was received in evidence as Trustee's Exhibit 'T'.

"Pursuant to said application, on or about September 1, 1928, the bankrupt signed, executed and delivered the issue of 'A' bonds in the aggregate principal amount of $825,000 dated September 21, 1928, maturing serially in instalments from March 1, 1931 to and including September 1, 1938 and Goldie, together with Foote and Malmberg, guaranteed the payment of the principal and interest of the first $250,000 of the 'A' bonds, by written agreement of guaranty endorsed upon said bonds prior to their negotiation.

"On October 11, 1928 the Holding Company conveyed the premises to the bankrupt, and on October 15, 1928, a certificate of title to the premises was duly issued to the bankrupt as fee owner, being certificate No. 43862 in the office of the Registrar of Titles of Hennepin County, Minnesota; and the bankrupt executed a mortgage or trust deed, dated September 1, 1928 to Chicago Title and Trust Company and H. J. Tansley as Trustee, which mortgage was duly registered in said office on October 15, 1928, as Document No. 81079. This mortgage was given to secure not only the 'A' bonds, but also the Subordinated 'B' bonds.

"Thereupon the bankrupt, with the participation of Goldie, sold and delivered the issue of 'A' bonds to H. O. Stone & Company, and H. O. Stone & Company thereupon proceeded with the advertisement and sale of the 'A' bonds to the public, with the authority of the bankrupt and of Goldie; more particularly H. O. Stone & Company issued to the public its circular-offering of the 'A' bonds (a specimen of which was received in evidence as Trustee's Exh. 'H') wherein it represented to the public that 'The payment of the principal and interest of the first $250,000.00 of the $825,000.00 bonds therein offered is personally guaranteed by' Goldie, Foote and Malmberg; and filed that circular with the State Securities Commission of the State of Minnesota in support of its application to register the sale of said bonds in Minnesota; and H. O. Stone & Company procured registration of said bonds in the State of Minnesota on the faith of that circular; in addition, the bankrupt filed a copy of said loan appli-

"The entire enterprise of the bankrupt was founded upon the financing of this project through the registration of its stock, the placing of said mortgages, and the issuance of its bonds, and many, if not all, of the creditors whose claims have been filed and allowed in the above proceeding extended credit to the bankrupt upon the faith of the scheme of financing set up, which necessarily included the ownership of the property in fee by the bankrupt; and said creditors relied upon the representation that the bankrupt had paid the entire purchase price of said property, excepting the bond issue, and was the owner in fee thereof, free and clear of encumbrances, excepting

---

cation, said circular, and a certain Voting Trust Agreement executed by Goldie, Foote and Malmberg, dated July 30, 1928, to secure said guaranty (which was received in evidence as Trustee's Exh. 'J'), in support of its application to register the sale of its stock, and procured a license to sell the same on the faith of the representations made in said documents.

"A large number of the 'A' bonds were in fact sold to members of the public by H. O. Stone & Company, including a large number of the guaranteed bonds, and many of said guaranteed bonds are in the hands of members of the public outstanding and unpaid.

"In 1928 the bankrupt entered into a contract with Joseph A. Holpuch & Company, a contracting firm of Chicago, for completion of the construction of the building, and work proceeded on the building until the fall of 1929. When work was stopped on the building, the superstructure had been erected and the building enclosed, but work on the interior of the structure was not completed and the building still stands in this unfinished state. After that time the bankrupt engaged in no business excepting litigation, and attempts to revive its promotion of this project.

"In 1932, through foreclosure of mechanics liens upon the mortgaged property, prior in lien to said mortgage, the security for the payment of said bonds was wholly lost and extinguished, and holders of the guaranteed bonds have no security or collateral for their payment, except said guaranty. 27 holders of [guarantted] 'A' bonds aggregating in principal $29,500 have duly filed claims thereon in this proceeding, which have been duly allowed; none of said claimants have received any payment on account of said bonds for principal or interest thereof, and said bonds remain wholly unpaid; the dividend payable to said claimants on account of their claims out of the above estate will in no event exceed 6% of the allowed amount of their claims, and said claimants have no remedy for the payment of the balance thereof except as this court may, by the exercise of its equitable powers, adjudicate the equities between said claimants and the guarantors upon said bonds, and conform the distribution of the estate to accord with the rights of the parties."

The statement of facts particularly applicable to this issue is as follows:

"On July 6, 1928 the bankrupt filed its application with the Securities Division, Department of Commerce, of the State of Minnesota for the registration of its stock. Said application was received in evidence as Trustee's Exh. 'A'. At the time, it was represented to the Commission that the bankrupt had already paid $8500.00 to the Holding Company on account of the purchase price of its property.

"Pursuant to said application the Department of Commerce of the State issued its conditional order of registration on July 31, 1928 whereby it licensed the bankrupt to sell 1000 shares of Class 'A' common stock of the par value of $100 per share, and 500 shares of no par Class 'B' common stock, in units, upon compliance with certain specified conditions, among others that the fee owners of the premises, to [with], the Holding Company, should enter into an agreement with the bankrupt to deed the property to it, 'free and clear of all encumbrances for the following consideration: The sum of $40,000 cash payable as follows: $8500 thereof which has heretofore been paid, $16,500 payable September 1, 1928, $15,000 payable October 1, 1928, and $35,000 par value of Class 'A' Common stock' of the bankrupt, and that a certified copy of such contract be filed with said Commission with an opinion of an attorney showing good and satisfactory title in said Holding Company subject to said contract for deed: Said conditional order was received in evidence as Trustee's Exhibit 'B'.

"In purported and ostensible compliance with said conditional order, the bankrupt, with the participation of Goldie, filed with said Commission two certain contracts for deed, as follows:

"(1) Contract dated August 6, 1928 between the Holding Company as vendor and the Club as vendee, wherein the Holding Company purported to sell the property to the Club for the sum of $75,000 on the precise terms stated in said conditional order.

"(2) A contract likewise dated August 6, 1928 between the Club as vendor and

the trust deed securing its bonds, and said enterprise would not have gone forward nor would said creditors have extended credit to the bankrupt or purchased its bonds except for such representations; and the attempt by Goldie hereinbefore found constitutes a deliberate attempt to hinder, delay and defraud the creditors of the bankrupt."

From these facts and the findings thereon, it thus appears that the main bases of the findings are the instruments by which the Holding Company (dominated by claimant) replaced the conveyance of title to the bankrupt by a sales contract; claimant's endeavors to secure amendment of the claims of his associates (Mendelson and

---

the bankrupt as vendee, wherein the Club in turn purported to sell said property to the bankrupt as vendee for the sum of $75,000, again upon the precise terms stated in said conditional order. Said contracts for deed were received in evidence as Trustee's Exhibits 'L' and 'L-1'.

"Thereupon the bankrupt, with the participation of Goldie, represented to said Commission that it had fully complied with the terms of said conditional order, that the balance of the purchase price payable in form under said contracts in stock and in cash had in fact been paid, and that the bankrupt was the owner of said property free and clear of all encumbrances except the mortgage dated September 1, 1928, securing the issue of bonds upon said property, all as evidenced by the conveyance of October 11, 1928 from the Holding Company to the bankrupt, the certificate of title to the bankrupt of October 15, 1928, No. 43862, and a policy of title insurance issued by Chicago Title and Trust Company for the bankrupt on October 16, 1928 which was received in evidence as Trustee's Exh. 'V'.

"On the faith of said representations, the Commission issued its order of registration on *November 5, 1928*, whereby it licensed the sale of the aforesaid stock of the bankrupt, and on November 8, 1928 registered the sale of the 'A' bonds of the bankrupt upon the application of H. O. Stone & Company. Said order of registration of *November 5, 1928* was received in evidence as Trustee's Exh. 'D'. Under the authority of said registrations a considerable amount of the bankrupt's securities were sold to members of the public, with the active participation of Goldie.

"V. In violation of the representations made to the Commission, and in attempted fraud of all of the creditors of the bankrupt, Goldie, together with his associates in the Holding Company and in the bankrupt, caused the following conveyances and transactions to be executed and recorded:

"(a) After the conveyance from the Holding Company to the bankrupt, and the issuance of certificate of title to the bankrupt, and the execution of the mortgage or deed of trust, and the registra-

tion of the stock of the bankrupt, the bankrupt reconveyed said premises to the Holding Company by warranty deed, *dated November 9, 1928*.

"(b) Said deed was registered on January 4, 1929 and a new certificate of title to said premises was issued to the Holding Company as owner in fee, under date of January 4, 1929, being Certificate No. 44182.

"(c) The Holding Company then executed a new contract for deed back to the bankrupt, *dated November 9, 1928*, but acknowledged on January 18, 1929, wherein the Holding Company as vendor again agreed to sell and deliver said premises to the bankrupt as vendee, and the bankrupt purported to agree to purchase said property for the sum of $1,-135,000 as follows: $10,500 by its promissory note, $1,075,000 by assuming and agreeing to pay the aforesaid bond issue; and the balance of $49,500 in installments as follows: $5,000 each on the 15th day of February, March, April, and May, 1929, and $7,500 each on the 15th day of June, July and August, 1929 and $7,000 on the 15th day of September, 1929, together with interest at the rate of 6% per annum. A photostat copy of said contract for deed was received in evidence as Claimant's Exhibit 1.

"(d) The bankrupt issued a note to the Holding Company, dated as of *November 9, 1928*, in the principal amount of $10,500, purporting to represent the down payment on said contract for deed.

"(e) The Holding Company in August 1929 issued a notice of cancellation of said contract for deed of November 9, 1928, for alleged default therein (Trustee's Exh. W).

"(f) In its schedules, verified by Goldie on February 3, 1933, the bankrupt listed Main-East Prairie Road Gardens Syndicate as the assignee of the vendor's interest in and to the unpaid balance of said contract for deed, and thereby an unsecured · creditor of the bankrupt in the amount of $49,500, together with interest at the rate of 6% from November 9, 1928.

"(g) Said J. R. Mendelsohn and Leonard I. Sutterman, the associates of Goldie in said Holding Company, claiming to be the assignees of the Holding Company, with the active participation of Goldie,

Sutterman); and the suit of the Holding Company to cover large amounts ($49,500.00) created as a part of the sales contract of the land to bankrupt.

The original arrangement as to the land seems to have been that there was a contract between the Holding Company and the bankrupt whereby the former was to convey the land to the bankrupt on payment of $75,000. At the same time, there was another contract between bankrupt and the Club whereby the former was to convey to the Club for the same sum, payable one dollar in cash and the balance when the Club dues collections should reach $300,000.00. There were subsequent alterations (not here material) in these contracts. The important consideration is that, at the time the application was made to the Commission, the Holding Company had not relinquished title but was under contract to convey. It is evident, from the order of the Commission, that it understood the title was not in the bankrupt when it considered the application and made a "conditional order" on July 31, 1928.[5] In that order was the requirement:

"That the fee owner of the following described property located in the city of Minneapolis, Hennepin County, Minnesota: [property description omitted here] enter into an agreement with applicant to deed said property to applicant free and clear of all encumbrances for the following consideration:

---

on April 28, 1933, presented claims against said estate, No. 103 and 148, in the amount of $12,000 each, on account of said $10,500 note and another $1500 note of the bankrupt; and on November 22, 1935 in the name of Main-East Prairie Road Gardens Syndicate, said to be a co-partnership consisting of said Sutterman and Mendelsohn, petitioned this court for an order amending their claims to include an additional amount of $49,500, or for an order allowing a proof of claim to be filed [nun] pro tunc in the amount of $49,500, together with interest, on the claim that said amount was an unpaid balance due on said contract for deed of November 9, 1928; and that said contract for deed had been assigned to said Syndicate.

"(h) Said Goldie caused said Holding Company to commence an action against the Trustee herein on December 24, 1938 in the District Court of Hennepin County, State of Minnesota, Fourth Judicial District, entitled 'Calhoun Beach Holding Company, Plaintiff, vs. Harold [E.] Cox, as Trustee in Bankruptcy of the Calhoun Beach Club Holding Company, Bankrupt, Defendant', to recover all the proceeds of the recovery made by the Trustee on the contractor's bond written by the Fidelity & Casualty Company of New York as surety for the Joseph A. Holpuch & Company, said recovery constituting all of the assets that came into the above estate with the exception of $20 recovered from other sources. Said action was based upon said contract for deed of November 9, 1928, and the claim that said purported deferred balance of $49,500 remained unpaid, and that the proceeds of the bond recovery belonged to the Holding Company; and that said Main-East Prairie Road Gardens Syndicate as assignee of said contract had re-

assigned the same to the Holding Company."

"Said petition recited in subparagraph V (g) supra, was brought on for hearing by the Trustee on October 4, 1938; on the return day pursuant to continuances requested by Goldie, who was actively assisting the petitioners in propounding and presenting the same, the matter was continued and was thereafter brought on for hearing and partially heard by the undersigned on October 21, 1938; upon said hearing said petition was by the undersigned denied, subject to a motion by the said Syndicate to amend, which motion was thereafter by the undersigned denied. No petition to review said order of denial was ever filed and said order has become final and conclusive.

"Said claims No. 103 and 148 recited in said subparagraph were by the undersigned on November 30, 1938, disallowed; no petition to review said order of disallowance was ever filed and said order has become final and conclusive.

"With respect to the action recited in subparagraph V (h) supra, the above court on January 14, 1939, on the petition of the Trustee issued its summary order, directed to the Holding Company, and on January 24, 1939 entered Findings of Fact, Conclusions of Law, Order and Decree wherein the court found that the claim asserted by the Holding Company was false, sham, and fraudulent as to creditors of the bankrupt, and that the Holding Company was estopped from maintaining said action; and restrained the [Hold] Company from maintaining the same, and ordered the dismissal thereof, and cleared away the claim of the Holding Company as a false cloud on the [tile] of the Trustee."

[5] This order was amended (August 7, 1928) in a manner not here material.

"The sum of $40,000 cash payable as follows: $8,500 thereof which has heretofore been paid, $16,500 payable September 1, 1928, $15,000 payable October 1, 1928, and $35,000 par value of Class A Common stock. And that certified copy of such contract be filed with this department together with the opinion of an attorney showing good and satisfactory title in said fee owner subject to said contract for deed."

The requirement of this order was not a deed to the bankrupt but a contract to convey on the terms set forth and a showing that the contracting conveyor had fee title clear except for such contract.

By two sales contracts dated August 6, 1928 (acknowledged later in August), the Holding Company obligated itself to convey the land to the Club on the terms set out in the conditional order of the Commission; and the Club to convey to the bankrupt on the same terms. It does not appear that these contracts were recorded but it seems they were presented to the Commission.

On October 11, 1928, the Holding Company conveyed the land to the bankrupt by warranty deed, stating that "the same are free from all encumbrances." On November 2, 1928, the bankrupt (by its secretary) wrote the Commission[6] wherein it stated:

"With reference to the [proff] of satisfactory title, I enclose herewith a carbon copy of a letter from the Chicago Title & Trust Company to H. O. Stone & Company, the bankers who are furnishing the money on the first mortgage bond issue, showing that the title is clear in Calhoun Beach Club Holding Company, Inc., [the bankrupt] subject only to the Trust Deed issued to Chicago Title and Trust Company covering both the first and second mortgage loans aggregating $1,075,000.00, and the Chicago Title and Trust Company has, or will, issue to the Chicago Title & Trust Company its insurance policy guaranteeing this Trust Deed to be a first mortgage upon the premises."

The Commission made its definite order allowing registration on November 5, 1928. Four days later (November 9, 1928), the bankrupt reconveyed the land to the Holding Company by warranty deed for free title subject only "to incumbrances now on said premises aggregating One Million Seventy-five Thousand Dollars ($1,075,-000.00)"—which was the deed of trust securing the bond issue. This deed was not recorded until January 4, 1929. By a sales contract (dated November 9, 1928, but not acknowledged until January 18, 1929, and, apparently, not recorded) the Holding Company agreed to reconvey this land to the bankrupt upon full payment to it of a "purchase price" of $1,135,000.00 in the manner and at the times following:

"Ten Thousand Five Hundred Dollars ($10,500) by executing and delivering to party of the first part, its promissory note in said amount, the receipt of which note is hereby acknowledged; One Million Seventy-five Thousand Dollars ($1,075,000) by assuming and hereby covenanting to pay in accordance with their terms, the principal and interest upon the now existing encumbrances against said premises aggregating said principal amount;

"And the balance of Forty-nine Thousand Five Hundred Dollars ($49,500), in installments following to-wit: Five Thousand Dollars ($5000) each on or before the 15th days respectively of February, March, April, and May, 1929, Seven Thousand Five Hundred Dollars ($7,500) each on or before the 15th days respectively of June, July, and August, 1929, and Seven Thousand Dollars ($7,000) on or before the 15th day of September, 1929.

"The party of the second part shall pay interest at the rate of six per cent per annum from and after this date on said deferred installments of Forty-nine Thousand Five Hundred Dollars ($49,500). Said interest shall be computed on said installment due dates on the balances of principal in each case remaining unpaid, and shall be paid together with and in addition to said installments of principal."

Thereafter claimant contended these instruments created a lien prior to the bonds issued under the deed of trust.

Either in August, 1929 (as stated by the referee), or early in September, 1929 (as shown by comparison of statements in notices to unsecured creditors signed by Brill and Maslon on August 30 and September 17, 1929), notice of cancellation, because of default in payments, of this last above sales contract was given.

---

[6] This letter states "In compliance with your request of September 6, 1928, as to certain conditions before the license to sell our stock will be issued, I beg to submit the following." We are unable to find in the record this request. However, we may infer, from this letter, that a part of the request had to do with the proof of satisfactory title to the land.

The bankrupt's schedules (verified by claimant on February 3, 1933) listed Main-East Prairie Road Gardens Syndicate as the assignee of the vendor's (Holding Company) interest in the above sales contract and, thereby, an unsecured creditor for $49,500.00 with interest from November 9, 1928. The Syndicate seems to have been a partnership composed of Sutterman and Mendelson, who were claimant's associates in the Holding Company.

On April 28, 1933, Sutterman and Mendelson (as individuals) filed separate claims (Nos. 103 and 148). Each of these claims was for the same two debts—one of which was for $10,500.00, being the note given by the bankrupt under the above sales contract of November 9, 1928. This claimant participated actively therein.

On November 22, 1935, Sutterman and Mendelson, in the name of the above Syndicate, filed a petition (based on allegations of lost claim papers sent to Mr. Goldie for attention) to amend their claims (Nos. 103 and 148) by adding the indebtedness $49,500.00 representing the unpaid balance (above the note for $10,500.00) on the sales contract. This was opposed by the trustee; and, upon failure of Sutterman or Mendelson to appear (after notice), this petition was denied by the referee on October 4, 1938. There was no petition to review this order.

On October 22, 1938, there was a special meeting of the board of directors of the Holding Company. The "officers" reported that the trustee in bankruptcy "had apparently succeeded in disallowing the claim of approximately fifty thousand dollars ($50,000) due this corporation under the terms of a Contract for Deed, and which claim had been assigned to the Main-East Prairie Road Gardens Syndicate for moneys due them from this corporation." A resulting resolution authorized the board of directors, through its officers, to "proceed with whatever legal action may be necessary to aggressively enforce and collect the moneys due this corporation under this Contract for Deed. They are authorized to commence whatever lawsuit may be necessary against the Trustee and/or his attorneys, the Surety Company who issued the Lien Bond, from whom recovery was made for liens placed against the property of this corporation. They are further authorized to commence suit against any person, persons, partnerships or corporations to recover the moneys due this corporation under this Contract for Deed,

or who have caused financial loss or damage to this corporation by any illegal acts or deeds."

On December 24, 1938, the Holding Company (dominated by claimant) filed an action in the State court against the trustee. This petition recited the above sales contract and that there was an unpaid balance thereon of $49,500.00; that the contract had been assigned to the above Syndicate and by it re-assigned to the Holding Company; that the Holding Company was the owner of the land but that both it and the bankrupt had lost title by reason of the foreclosure of mechanics' liens against the property; that there was a contractor's bond "to indemnify and save harmless the owners of the land * * * against loss by reason of lien filed thereon", which bond was "for the benefit of this plaintiff as owner of the fee title to said property and [to] save this plaintiff from loss of its title by reason of lien foreclosures"; that the receiver in bankruptcy had recovered $30,543.74 on said bond, which money was held by the trustee; and that "in equity and good conscience" this belonged to plaintiff; wherefore, judgment was prayed for said sum. Early in January, 1939, the trustee filed a petition to restrain this action. A decree resulted granting such restraint. Included in the decree was a finding that the contract of deed (above sales contract) was "fictitious" and, in the decretal portion, it is decreed "That the claim of Calhoun Beach Holding Company asserted against petitioner in the aforesaid action against him, is false, sham, fraudulent, and without color or right, and constitutes a false cloud on the title of petitioner to the assets of the above estate."

The foregoing history and transactions outline as follows. The claimant was the dominating force in the Holding Company which originally owned the land. He was the majority stockholder and dominant in the bankrupt. He was the moving force in the entire promotion plan involving the three corporations. He was the active personality in the movements to finance the plan, including Club memberships and arrangements to secure bond issues and to sell stock in the bankrupt. The deed from the bankrupt (of November 9, 1928) and the unrecorded sales contract of that date were deliberate steps to evade required conditions imposed by the Commission as prerequisites to registration of the stock of bankrupt for sale. The requirement of the Commission was for a sales contract show-

ing only $31,500.00 unpaid and to be payable $16,500.00 on September 1, 1928, and $15,-000.00 on October 1, 1928. The contract of November 9, 1928, called for $60,000.00 of which $10,500.00 was represented by a note and $49,500.00 by eight monthly instalment payments beginning February 15, 1929. From the filing of the bankrupt's schedules in February, 1933, to the denial of amendment of the Sutterman and Mendelson claim on October 4, 1938, this claimant was active in attempts to prove this $60,000.00 as unsecured claims against the estate. When such attempts were unsuccessful, the Holding Company (in which he was the dominant personality) endeavored, early in 1939, to deprive the estate of practically all its assets through an action resting upon this same sales contract. This action was to recover from the trustee the proceeds of the contractor's bond suit. The recovery in the bond suit by the trustee was in August, 1935. This claimant was thoroughly familiar with that proceeding and its results. Not until December, 1938, and then only after it became clear that the payments under the sales contract were disallowed in the bankruptcy proceeding, was this suit for the assets of the estate begun. These efforts in the bankruptcy proceeding, if successful, could have had only an adverse effect upon all other allowed unsecured claims because the amount of unsecured claims would have been increased by more than $50,000.00 since those claims ($49,500.00) bore interest. Had the suit for assets been successful, the Holding Company would have gotten all the assets and there would have been nothing left for the other unsecured or bond creditors. Whether or not the entire $60,000.00 was fictitious, as found by the trial court in the above re-

straining suit, so much of it as exceeded $31,500.00 seems clearly to be fictitious.

This outline reveals consistent and persistent efforts by the claimant to reduce the dividends to other unsecured creditors and, having failed therein, to absorb the assets of the estate—both to his advantage—and such efforts based upon claims which, to say the least, were questionable. It is not difficult to understand the anxiety of this claimant when faced with failure of his development plans and resultant loss to himself. Nor is it blameworthy that he should take all proper steps to protect himself from loss. However, the duty of a bankrupt (and where the bankrupt is a corporation, of its officers) is to aid the honest administration of the estate in all its aspects. It is highly improper for such officer to attempt to reduce or to deny the estate to honest creditors. We think this conduct is in "violation of rules of fair play and good conscience by the claimant; a breach of the fiduciary standards of conduct which he owes the corporation, its stockholders and creditors." Pepper v. Litton, 308 U.S. 295, 310, 60 S.Ct. 238, 247, 84 L.Ed. 281. Because of this, these claims should not participate with these other unsecured creditors. Since the harmful conduct here is more particularly directed at the creditors we might be disposed to postpone rather than disallow these claims upon this ground. However, there is no chance of the other unsecured creditors receiving more than a small percentage of their claims so that postponement instead of disallowance would be of no benefit to claimant; and the referee and the trial court have disallowed the claims for this reason. Therefore, we think this action should be affirmed.[7]

---

[7] We have not overlooked the argument of appellee that the statement of title in the bankrupt subject only to the bonds deed of trust (contained in the above letter of November 2, 1928, to the Commission from the bankrupt) is controlling as to deception. We view this statement rather as a part of an entire situation which includes all of the above related transactions. At the time this statement was made, it was true. There existed a valid reason for placing the title in the bankrupt so that it could execute the deed of trust securing the bonds. The Commission had not required title in the bankrupt as a condition for registration of the stock but only a sales contract. However, that requirement was of such a contract containing specified terms. While there would have been a deception of the Commission had the status of the title been changed after the order of registration, yet if that change had been simply and solely to a sales contract complying with the requirements of the conditional order of the Commission, the situation here would have been modified for the better. However, the change made here was to a contract very much more onerous on the bankrupt and in defiance of the requirements of the Commission. It cannot be assumed that the Commission would have issued its order of registration had this sort of contract been presented to it.

(2)  The Capital Contribution Point.

The view hereafter stated as to this point is that of the writer, the majority view being expressed in the concurring opinion by Judge JOHNSEN.

The finding of the referee (approved by the trial court) upon this point is as follows:

"In view of the relation of Goldie to the bankrupt, and more particularly the facts that he was its majority stockholder and managing officer, and entirely controlled its affairs, that it had no capital except the money obtained from the sale of memberships and the money furnished by him for the purpose of procuring such memberships, that all of the advances included in Goldie's claims were made solely for the purpose of getting the enterprise of the bankrupt under way and for the further purpose of enabling the Holding Company, with which Goldie was affiliated, to dispose of its real estate to its advantage, together with the further fact that the initial 20% commission credited to Goldie in the amount of $36,820.00 was also entered on the capital account of the bankrupt as a debit to capital stock, and was represented to the Securities Commission to be a deferred asset of the bankrupt (See Trustee's Exh. O, Report to Securities Commission, filed June 25, 1929), and was so shown in said audit report of December 31, 1928 (see Trustee's Exh. H), the court has concluded that, disregarding mere matters of form and ascertaining the ultimate relation of the parties, all of these advances, including those now evidenced by notes signed by the bankrupt, must be deemed to be capital contributions to the bankrupt and not loans which the bankrupt promised to pay; that it would be unconscionable to permit the assets of the bankrupt to be diminished by the allowance of Goldie's claims; and that on that ground, Goldie cannot prove claims in competition with outside creditors of the bankrupt."

Although such transactions will be carefully scrutinized, it is true (as appellant urges) that a stockholder (or officer or director) may become a creditor of the corporation—either through loans or advancements of the character of loans—where there is no fraud or overreaching. Richardson v. Green, 133 U.S. 30, 43, 10 S.Ct. 280, 33 L.Ed. 516; Marine and River Phosphate Min. & Manufacturing Co. v.

Bradley, 105 U.S. 175, 182, 26 L.Ed. 1034; Twin-Lick Oil Co. v. Marbury, 91 U.S. 587, 588-590, 23 L.Ed. 328; Jackman v. Newbold, 28 F.2d 107, 111, 62 A.L.R. 729, this Court; Stuart v. Larson, 298 F. 223, 225, 38 A.L.R. 79, this Court. And collection of such an honest indebtedness may be allowed in receivership or bankruptcy proceedings. Wheeler v. Smith, 9 Cir., 30 F.2d 59, 60, and see Stuart v. Larson, 298 F. 223, 38 A.L.R. 79, this Court.

But the issue now being considered does not "turn on the existence or non-existence of the debt" but rather involves "simply the question of order of payment" (Pepper v. Litton, 308 U.S. 295, 310, 60 S.Ct. 238, 247, 84 L.Ed. 281) "and so-called loans or advances by the dominant or controlling stockholder will be subordinated to claims of other creditors and thus treated in effect as capital contributions by the stockholder" (308 U.S. pages 309, 310, 60 S.Ct. page 246) in certain situations. Some of such situations are adverted to in Pepper v. Litton, supra, 308 U.S. pages 309–311, 60 S.Ct. 238, 84 L.Ed. 281. But whatever be the situation, obviously it is to be tested by "rules of fair play and good conscience." Pepper v. Litton, supra, 308 U.S. 310, 60 S. Ct. 247, 84 L.Ed. 281. The question is then whether such rules, on the fact situation here, justify or require treatment of these loans and advances as capital contributions.

The fact situation here is as follows. Claimant was the majority stockholder in, a director and officer and the dominating personality in the bankrupt. He was the dominant figure in the Holding Company which owned the land. He was the real force behind the promotion plan to improve the land by this building. The financing plan contemplated three methods of raising money to buy the land and to erect and furnish the building. The initial method was by Club membership fees which were to be turned over to the bankrupt when they reached a stated total. The other two methods were by sales of stock of the bankrupt and by issues of bonds by it. The advancements and loans in these claims were (so far as we can judge from the incomplete evidence and with small exceptions) made to forward the enterprise by supplying money needed by the bankrupt, in connection with the project of building or of financing and not available to it from any of the three above sources.[8]  With

---

[8] In these general statements, we are not thinking of all of the items of these claims. We have in mind only those items which were not disallowed. The disal-

the exception of the items (disallowed by the referee), there seems to be no dispute that they were used for such purposes. The advancements and loans seem to have been actually made; to have been made without overreaching so far as they were concerned; and to have been beneficial to the bankrupt.

In the making of such advances and loans as found actually to have been made, we find no such violation of "rules of fair play and good conscience" toward the creditors which would warrant these advances and loans being held to be capital contributions and, *as such,* to be subordinated to the claims of unsecured creditors. We think the referee and trial court were in error in so holding.

### (3) Claim for Services.

■ This is an item (in claim 184) of $300.00 for services alleged to have been rendered to the bankrupt between July 18 and October 12, 1932—the charge is $20.00 per day for fifteen days. The finding of the referee (approved by the trial court) was disallowance of this item on two grounds: (1) no supporting evidence, and (2) allowance would be in violation of a condition in the conditional registration order of the Securities Commission (July 31, 1928) "that no salaries be paid to any of the officers and directors of applicant for services rendered, save and except out of net profits arising from the operations of said Club property under said operating agreement," and the resultant waiver of salary filed with the Commission by claimant.

We need examine only the first ground. Counsel have not pointed out and we have been unable to find (after diligent search) any evidence supporting this item. Therefore, the disallowance thereof must be approved.

### (4) The Hendrickson Audit.

For convenience in consideration, the referee considered these claims in two time periods. The reasons for this method of consideration are stated by the referee to be that for the first period (October 9, 1926, to December 31, 1928) "the books of the bankrupt are reasonably complete." For the second period (after January 1, 1929), the referee stated there were no such books. The items falling within the first period included the first 37 items of claim No. 184 (aggregating $15,140.49) and all items of claim No. 185 (aggregating $20,212.84)—a total of $35,353.33. The second period covered 146 items (Nos. 38 to 183) aggregating $4,859.51.

As to the first period, the referee made extended findings resulting in an allowance of $156.76 on both claims—this being the net credit found in the balance of debit and credit in the transactions between bankrupt and claimant. These findings are set forth in footnote 9.[9] The evidence as

lowed items being advancements or loans after December 31, 1928, the $300.00 item for services, and two or three other items of advancement. This general statement is made purely for convenience in determining this issue of "capital contributions".

[9] These findings are as follows:

"In September 1929 Malmberg resigned as secretary-treasurer of the bankrupt and Goldie became his successor. At said time Malmberg turned over to Goldie all of the corporate books and records of the bankrupt in his possession including the minute book. In October 1929, Malmberg left the City of Minneapolis; thereafter, his office turned over to Goldie all files in connection therewith; at least since said time and until the bankruptcy herein Goldie had the actual custody and control of all of the records of the bankrupt. After the appointment of Harold W. Cox as Trustee herein, which appointment was made on April 28, 1933, and on August 15, 1933, Goldie delivered to the Trustee certain books and records of the bankrupt, including [he] accounts payable ledger and a journal for the year 1929. The Trustee thereafter delivered these books and records to Mr. Brecke, one of his counsel, who retained possession thereof until the fall of 1935, at which time Goldie took all of said books and records for the purpose of preparing his amended claims, and ever since said time Goldie has retained possession thereof. Upon this hearing Goldie produced the journal and ledger of the bankrupt, which contained entries of its business or of its financial transactions up to December 31, 1928. Said ledger was received in evidence as Goldie Claim 185, Exhibit 3, and said journal was received in evidence as Goldie Claim 185, Exhibit 4. Certain other fragmentary records were also produced by Goldie (Trustee's Exh. G, and Goldie Claim 185, G. 2) but no further books reflecting any of the bankrupt's financial transactions subsequent to the year 1928 were produced although the Trustee repeatedly demanded their production, specifically production of the

to both periods (introduced at the hearing) consisted of various documentary matters and oral testimony by Mr. Goldie, Mr. Amos Deinard, Mr. Ernest Malmberg and

Minute Book, Stock-Certificate Book, Ledger for 1929, check-books and journal for 1929. It appears that the minute book of the bankrupt corporation was never delivered to the Trustee, and that the Trustee and his said attorneys have never had possession thereof.

"In view of the fact that the books of the bankrupt are reasonably complete for the period up to December 31, 1928, and there are no books thereafter, the court for convenience will consider these claims in two periods:

"A. The period from October 9, 1926 to December 31, 1928.

"B. The period after January 1, 1929.

"A. The first period includes all of the 32 items of claim No. 185, aggregating $20,212.84, and the first 37 items of claim No. 184, aggregating $15,140.49, as they are listed on tabulations introduced in evidence as Goldie Claim 185 Exh. 1, and Goldie Claim 184, Exh. A., or a total of $35,353.33. All of the items of claim No. 185 are reflected on the journal and ledger of the bankrupt; of the 37 items of claim No. 184, all except items 1, 2, 4 to 9, 17 to 19, 28, 31 and 36, are credited to Goldie on the ledger.

"B. The second period includes items 38 to 183 of claim No. 184, aggregating $4859.51. None of these items are reflected on the books of the bankrupt produced.

"VII.

"Period A

"Claim No. 185 comprises 32 notes signed by the bankrupt, aggregating in principal amount $20,212.84, all payable on demand and bearing interest at 6%, a list of which notes, together with a schedule of supporting checks and entries was received in evidence as Goldie Claim 185, Exh. 1. The 13 notes dated from November 20, 1936 [1926] to April 20, 1928 are signed for the bankrupt by Goldie; the remaining 19 notes dated from May 4, 1928 to November 15, 1928 are signed for the bankrupt by Malmberg. The 32 notes were received in evidence as Goldie Claim 185, Exh. 2.

"Note item 1, dated November 20, 1936 [1926], principal amount $5287.84, evidences the following account: Between October 9, 1926 and November 20, 1926 the Holding Company issued 74 checks to various persons, which together with four memoranda entries of October 19, 20 and 21, 1936 [1926], aggregate $5,287.84, all in connection with the promotion of the Club membership campaign. The 78 items are individually listed as Items 1–6, and 7–74, on Goldie Claim 185, Exh. 1, and are recorded in Fol. A, B and C of the journal. Under date of November 20, 1926 the account of Goldie on the bankrupt's books was credited in said amount, and said account is now evidenced by said note.

"Note items 2 to 32 inclusive evidence the following transactions: Between January 3, 1927 and November 15, 1928, the Holding Company, Goldie and the Continental Finance & Mortgage Company, a concern in which Goldie was financially interested, issued 28 checks either to the bankrupt or to Goldie who in turn endorsed them to the bankrupt, which together with 4 journal entries, aggregate $14,925, representing advances of money to the bankrupt, and said account is now evidenced by said notes. The 32 items are individually listed as Items 75 to 106 on Goldie Claim 185 Exh. 1, and were listed in the schedules of the bankrupt.

"VIII.

"Period A

"Within this period, Claim No. 184 includes 37 items of claimed advances to the bankrupt, listed as Items 1 to 37 inclusive on Goldie Claim 184, Exh. A, aggregating $15,140.49. The supporting checks for these items are included in Goldie Claim 184, Exh. B. These checks were issued by Goldie, the Holding Company, and the Continental Finance & Mortgage Company, to the order of the bankrupt and other persons.

"Item 10, $1500, does not represent an advance to the bankrupt but mere repayment by Goldie on July 25, 1927 of a temporary loan from the bankrupt to him of $1500 made on June 13, 1929, as recorded in Fol. 72 and 82 of Goldie Claim 185 Exh. 3, and in a separate account and in the Accounts Receivable of the ledger.

"IX.

"Period A Ledger Record

"The Accounts Payable ledger of the bankrupt down to December 31, 1928 shows the following account with Goldie: Total credits of $34,062.84, total debits of $8,425, and a balance due Goldie as of December 31, 1928, of $25,637.84. The credits include

"(a) principal of all of the notes in Claim 185, and

"(b) items of Claim 184 down to December 31, 1928, in an amount in excess of $13,000

which approximates the first 37 items of claim 184, excepting item No. 10. The debits include 13 checks to Goldie dated

apparently some others. The only oral testimony appearing in this record is a por- tion of that by Mr. Malmberg. The other oral testimony, as summed up in the cer-

from November 20, 1926 to December 12, 1928, amounting to $8225, and 2 journal items amounting to $200, and are admittedly a proper charge, and comprise the credit allowed by Goldie in his statement of claim No. 184.

"X.

"Period A Additional Debit

"As of May 31, 1928, the bankrupt made an accounting and stated an account with Goldie, with reference to commissions earned by him in the membership campaign, and disbursements made by the bankrupt to his order and for his use in connection with said campaign. On that date the total paid-in Club memberships (in notes and cash) amounted to $184,100. Goldie was credited upon the books of the bankrupt with 20% thereof, to-wit: $36,820 (notwithstanding that under said contracts he was in fact entitled to only 15% of memberships applied for prior to February 14, 1927), and said item of $36,820 was entered as a credit to his account upon a separate account page of the bankrupt's ledger. On that date the bankrupt allocated to the membership campaign out of the sales expense and general and executive expense incurred by it the sum of $59,973.76, as shown by the Expense Analysis in the back of the ledger, the Sales Commission Expense ledger sheet, the ledger sheets of the drawing accounts of Goldie and his solicitors, and Fol. 40 B and 40 C of the journal; and entered the same as a debit to Goldie's account on the ledger, leaving a debit balance against Goldie on account of the campaign expense in the amount of $23,- 153.76, as recorded in Fol. 40 D of the journal and in the ledger. Under date of May 31, 1928 that debit balance was transferred to the Accounts Receivable ledger as a charge against Goldie.

"In support of its application to the Securities Division for the registration of its securities, the bankrupt filed the following documents:

"(1) Its application (Trustee's Exh. A) containing a statement of its assets and liabilities as of May 31, 1928, and in said statement included among the assets as an account receivable the sum of $26,- 006.91, which comprised the aggregate of said debit balance due from Goldie in the sum of $23,153.76, and another account receivable entered in the name of Calhoun Beach Riding Stables in the sum of $2,653.15.

"(2) A balance sheet of May 31, 1928 certified to by its auditor as 'prepared from figures as taken from the books of account', wherein said item of $26,006.91 is included among the assets as an account receivable. (Trustee's Exh. Q).

"(3) An affidavit of its bookkeeper certifying to the accrual of a 20% commission for the Club membership sales, and that the balance of the sales proceeds were left for the bankrupt. (Trustee's Exh. P).

"After May 31, 1928, and between June 1, 1928 and October 31, 1928, Goldie was debited with additional items of campaign expense, which increased said debit balance of May 31, 1928 to $24,294.30. Said additional items were likewise transferred to the Accounts Receivable ledger, and in addition, two items of November 30, 1928 and December 31, 1928, aggregating $1186.78 were charged to Goldie on the Accounts Receivable ledger, although not entered on the campaign expense ledger sheet. It appears therefore from the Accounts Receivable ledger that the debit balance against Goldie as of December 31, 1928 was the sum of $25,481.08.

"XI.

"Period A Additional Debit

"As of December 31, 1928 the bankrupt's auditor, Hendrickson, at the request of the bankrupt, made an examination of the bankrupt's books and furnished an audit report thereof to the bankrupt and Goldie, wherein he reported Goldie indebted to the bankrupt on account of the excess of expenses over 20% commission upon said membership campaign, in the sum of $25,525.08, which represents a discrepancy of $44 from said figure of $25,481.08, appearing on the ledger. In said audit report said Hendrickson reported the total of commissions on memberships in the aforesaid sum of $36,820 as a deferred charge upon the asset account, to be retired by charge against surplus in accordance with the entries found upon the ledger account.

"In said audit report, Hendrickson also listed only one item owing to Goldie, under the heading, 'Notes Payable—Officers, $23,212.84', which is exactly $3000 more than the 32 notes included in Claim No. 185, but $2425 less than the credit balance appearing on the Accounts Payable ledger of the same date.

"XII.

"Period A State of Account

"The court has concluded that as of December 31, 1928

"(1) Goldie is entitled to a credit, as shown on the ledger account, of $25,637.-

84, which represents the net amount of his advances down to that date, and

"(2) Goldie must be charged with the debit shown on the ledger account, of $25,525.08, as a minimum for the excess of campaign expense chargeable to Goldie over and above the commission allowed to him; so that, according to the books of the bankrupt, the bankrupt was indebted to Goldie on December 31, 1928, in the sum of $156.76 and no more.

### "XIII.

"The evidence tends to show that in April 1929, on an unspecified date after the 16th of April, a meeting of the Board of Directors of the bankrupt was held in the office of Malmberg, who was then an officer of the bankrupt and acting as its attorney. The Board of Directors then consisted of at least four members; three of them, Malmberg, Foote and Goldie, were present, and 'one, George Springer, who was an officer of H. O. Stone & Company, was absent. At said meeting a resolution was presented attempting to cancel Goldie's indebtedness to the bankrupt on account of the excess of campaign expenses over the 20% commission and thus restore him to his status as a creditor of the bankrupt; Malmberg objected to such cancellation until the building should have been completed, and voted against the resolution, but there is evidence to show that Goldie and Foote voted for it, and regarded it as adopted. The minute book of the bankrupt has not been produced by Goldie nor has [an] written record been produced of the corporate action claimed to have been taken at that time. There was no antecedent obligation on the part of the bankrupt to cancel Goldie's liability; as the recipient of this gratuitous cancellation, the court has concluded that he was disabled from voting for the adopting of said resolution, and without his vote, there was no quorum; and because of the voting trust existing between Foote and Goldie dated July 20, 1928 (which was received in evidence as Trustee's Exh. 'J') that Foote was likewise disabled from voting for the adoption of such resolution and said resolution was a nullity.

"At said time, much of the indebtedness proved against this estate had already accrued; the directors then had no power to appropriate the assets of the corporation by releasing Goldie's liability for the benefit of Goldie, a director, without any consideration, and said attempted corporate action constituted a fraudulent transfer voidable by the Trustee of this estate.

"The bankrupt procured registration of its securities on the faith of the financial statements filed by it in 1928 (Tr. Exh. Q), showing among the assets of the bankrupt the indebtedness of Goldie to it on account of the excess of campaign expenses over his commissions, in the then amount of $23,153.76, and the securities of the bankrupt were sold pursuant to such registration, with the active participation of Goldie; and Goldie is now estopped to claim that said indebtedness was cancelled and that he was restored to the status of a creditor of the bankrupt. No entries were ever made on the bankrupt's books to record said purported cancellation.

"It appears that in the fall of 1928 Goldie consulted Amos Deinard of the firm of Leonard, Street & Deinard, concerning his personal interests in the Calhoun Beach enterprise, and from that time until the fall of 1929 Amos Deinard advised Goldie from time to time concerning his rights and interests; that the minute book of the bankrupt, and other records, were then submitted to Amos Deinard who recommended certain changes for the protection of Goldie's interests. A letter of February 20, 1929, from Amos Deinard to Goldie was offered in evidence by the claimant, together with a subsequent letter written by Amos Deinard to Ernest Malmberg on April 16, 1929, marked Claimant's Exhibit 'AA5'. Among other things, the letter of February 20, 1929, addressed to Goldie contains the following recommendation:

" 'We also called to your attention the deficit charged to you on the books of the corporation in the sum of $25,525.08. The minutes of the Club corporation of February 7, 1927 show that it was intended that the Calhoun Beach Club Holding Company wipe out this deficit. In order to complete the book record the minutes of the latter corporation should show that this deficit is wiped out by some means or other. Surely Mr. Malmberg is so thoroughly familiar with the books and records as to be able to make this correction without difficulty.'

It also appears that during April of 1929 Amos Deinard attended a directors' meeting of the bankrupt corporation, at which, as Malmberg testified, the resolution cancelling Goldie's obligation to the bankrupt on account of campaign expense was proposed, and attempted to be passed by the affirmative vote of Goldie and Foote as aforesaid. Amos Deinard was at that time, and still is, a member of the firm of Leonard, Street & Deinard, of which firm one of the Trustee's counsel, Benedict Deinard, was, and still is, also a member. The Court has concluded that these circumstances are immaterial insofar as these proceedings

tificate of the referee, is as set forth in footnote 10.[10]

From the findings (footnote 9) and the recital of evidence (footnote 10), the

are concerned; and that none of the activities of Amos Deinard in 1928 and 1929 in any way bind the Trustee, or in any [    ] affect the rights of the creditors in this proceeding."

[10] After setting forth the pertinent documentary exhibits, this evidence is as follows:

"The evidence showed that in August, 1933, Goldie delivered to the Trustee certain books and records of the bankrupt including the accounts payable ledger and the 1929 journal; that these books were delivered to Mr. Brecke, who retained possession of them until some time in the fall of 1935 when Goldie took all of the books and records from Mr. Brecke's office; since which time Goldie has retained possession of them. Goldie produced the ledger (Goldie claim 185 Exhibit 3), the journal (Goldie claim 185, Exhibit 4) and other fragmentary records (Trustee's Exhibit 185, Exhibit G-1) but no other books, although the Trustee repeatedly made demand for their production, calling especially for the minute book, stock certificate book, the 1929 ledger, and checks books, and other journals. The evidence showed that the minute book was never at any time delivered to the Trustee.

"Goldie testified that the office of the bankrupt was at 202–4 Lincoln Building until 1929; that the office was then moved to 608 Lincoln Building where it was until 1936. That the Calhoun Beach Club itself never had an office, but that the Holding Company had its office with the bankrupt; that his (Goldie's) salary was $150 a week, and that he never received a penny from the Club. That the first president of the Club was Louis L. Collins who occupied the office for a year, and was succeeded by H. G. Foote, who was succeeded by Clyde Weaver, who was succeeded by H. W. Rolph, who is still president. That the Club had 1400 members; that the salesmen like Kopald, who sold club memberships, received 15% commission; that he (Goldie) received a 20% commission out of which he paid the salesmen, leaving an overriding 5% commission for himself. The exhibits show earlier written agreements for a lesser percentage. That the commission was paid in checks. When his attention was called to the entry in the ledger of 'commissions $36,820', he said he did not know what he received.

"Later the witness Goldie testified that an item of $23,153.76 (the debit balance against him as of May 31, 1928) represented the excess of expenditures over and above the credit of $36,820; that his arrangement with the bankrupt was to receive 20% commission and that he was to pay the salesmen 15%; that the 20% commission included engaging salesmen, holding meetings and carrying all activities in the membership campaign; that the 20% covered the salesmen's 15% and 5% for incidental expenses for managing the campaign; that not all of the items charged to the membership campaign related to the campaign; that some of them were for the conduct of other parts of the project, such as electricity in the building and photostats required by the mortgage company, etc.

"Goldie testified that in April, 1929, there were several directors meetings in Malmberg's office; he did not remember the dates but they were indicated, he thought, by the fee bill, he received from Amos S. Deinard; that there were two meetings; that Mr. Springer could not come to the first meeting; that Amos S. Deinard asked whether Malmberg had prepared a resolution to correct the books and records of the bankrupt so that there would be no possibility of misunderstanding that the $25,000 that had been charged for campaign expenses was never intended to be charged to Goldie personally; that Malmberg asked Amos Deinard whether he had prepared a resolution; that Amos Deinard had the [resulution] all prepared; that it was read at that meeting and was acted upon and adopted and so ordered; that present at that meeting were Malmberg, Foote, Springer, Goldie and Amos Deinard.

"Goldie further testified that he did not know whether the resolution was adopted at the meeting on April 4, 1929, or on a later date; that as he recalled it, the resolution was to the effect that the books and records should be corrected so that there would be no indication that the $25,000 was not to be considered as a charge against Goldie; that at the time Malmberg and Goldie were at loggerheads; that Malmberg finally voted for the resolution; although he was obdurate; that Malmberg knew that it was a bookkeeping error; that all four directors voted for the resolution; that at the time Amos Deinard said that all knew that there was never any intention to make this charge against Goldie. Later Goldie testified that at the first meeting of the Board Springer could not come and that he wired or wrote to that effect; that there were only four directors; that Mendelsohn had been a director, but he was not sure whether he had then

force and place of the audit made by Hendrickson clearly appears. Appellant contends here that the referee improperly allowed the debit item for $25,525.08 (in the audit) against claimant.[11] The reason urged why this debit item should have been rejected is that it was a bookkeeping error (a) in that Hendrickson's figures were based upon a commission to claimant of only 20% of the fees of membership in the Club secured by claimant, whereas, the original contracts for such service (successively allowing a commission of 15% and later 20%) were altered (November 1, 1927) to allow 30%; and (b) in that Hendrickson failed to take into account a resolution of the *Club* (February 7, 1927) whereby the Club was to absorb overrunning expense.

(a) *As to the 30%.* The first mention of this point which we have been able to find is in the brief filed here by appellant. So far as the record here reveals, is was not raised nor considered nor determined by the referee or the trial court. We have found no evidence bearing upon it except the resolution by the Board of Governors of the Club (in the minutes of the Club) which is as follows: "It was further moved by Mr. Ekstrum and sec-

onded by Mr. Magney that the Calhoun Beach Club Holding Company be allowed a fee of 30% of the membership fee of the regular membership."

■ Where an issue (except of jurisdiction) has not been raised or considered below but is presented here for the first time, this Court will not examine it (Helvering v. Tex-Penn Oil Co., 300 U.S. 481, 498, 57 S.Ct. 569, 81 L.Ed. 755; New York Life Ins. Co. v. Calhoun, 114 F.2d 526, 543, this Court, certiorari denied 311 U.S. 701, 61 S.Ct. 141, 85 L.Ed. 455; Falstaff Brewing Corp. v. Iowa Fruit & Produce Co., 112 F.2d 101, 106, this Court. This is emphasized where the matter is one of fact and the record brought here fails to reveal sufficient for a determination of the issue by this Court.

(b) *The Resolution of the Club.* By contract of December 11, 1926, the Club employed the bankrupt to conduct a campaign for members for the Club. Thereby the Club agreed to pay and the bankrupt to accept "in full compensation for services *and expenses* of said second party [the bankrupt] in connection with said campaign the sum of 15% of the membership fees"; the bankrupt was "authorized to

resigned or not. (The minute books of the bankrupt had never been turned over to the Trustee. They were not produced or accounted for by Goldie during the above proceeding.) Springer did attend the meeting of the board of directors held in Malmberg's office sometime after April 16, 1929, at which meeting the resolution was unanimously adopted by the directors present.

"The testimony showed that in the fall of 1928 Goldie consulted Amos S. Deinard concerning his personal holdings and interests in the Calhoun Beach enterprises, and that from that time until September, 1929, Mr. Amos Deinard advised Mr. Goldie with reference to his personal relations to his associates in Chicago, Sutterman, and Mendelsohn, and his relations with other stockholders of the bankrupt, and made one trip to Chicago in the summer of 1929 for the Calhoun Beach Holding Company in an attempt to release the pay-outs, and advised Goldie in his dealings with a Mr. Bentley. In connection with this work, Goldie submitted the minute book of the bankrupt to Mr. Amos Deinard who recommended certain changes in it; during April 1929 Mr. Amos Deinard attended a directors meeting. Mr. Goldie testified that in addition to the minute book, he

also submitted to Mr. Amos Deinard the Hendrickson audit (Trustee's Exhibit 'H') or a similar audit.

"Mr. Amos Deinard testified that he had now no independent detailed recollection of any of the work that he performed for the Calhoun Beach Holding Company, Mendelsohn, Sutterman and Goldie, except that he attended a number of conferences where Goldie and his associates were present, one of which at least was at Malmberg's office. He also remembered a trip to Chicago; otherwise he could only refer to the fee bill for a statement of the work done. Other than this he had no recollection of any formal directors' meeting, or whether he attended one and if so just what business was transacted.

"Malmberg testified Springer was not present when Amos Deinard's draft of resolution was acted upon. He also testified that he voted against the resolution. His [testimoney] was transcribed."

[11] This item appears in the audit as:

"Accounts Receivable-Officers $25,525.08

"This item represents the excess of expenses necessary over 20% commission allowed for membership campaign by Mr. Harry S. Goldie, the Vice President of the company and membership campaign manager."

withhold" the commission; and the bankrupt might employ others to carry on the campaign for it "at its own expense" (italics added.) On the same day, the bankrupt and claimant contracted for employment of claimant by the bankrupt to conduct the membership campaign upon the same terms as in the above contract between bankrupt and the Club. February 7, 1927, a resolution of the Board of Governors of the Club was adopted "that the club holding company [the bankrupt] be allowed 20% of all membership fees." In pursuance of this resolution and on February 15, 1927, the contract between bankrupt and the Club was modified only to increase the commission to 20%. The same day a like change was made in the contract between bankrupt and claimant. On November 1, 1927, the hereinbefore quoted resolution was adopted by the Board of Governors of the Club increasing the commission to 30%. Although a change had been made in the first contracts in order to cover the increase to 20% authorized by the above resolution of February 7, 1927, this record is silent as to any changes in the contracts following the November 1, 1927, resolution. Therefore, the situation at all times was that the bankrupt was to receive from the Club the percentage commission and was obligated to pay all expenses of the campaign. The contracts between bankrupt and claimant were identical in this respect.

At the request of bankrupt, C. V. Hendrickson made an examination "of books and accounts" of the bankrupt as of December 31, 1928. The result of this examination was embodied in an audit report dated January 21, 1929. A copy of this report was furnished both to bankrupt and to claimant. That report contained the above item of $25,525.08 as an account receivable against claimant representing "the excess of expenses necessary over 20% commission allowed for membership campaign by Mr. Harry S. Goldie."

Appellant contends that by a resolution of the Club, "in its minutes of February 7, 1927," the Club "was to absorb overrunning expense" of the campaign, which would eliminate this debit item against claimant in the Hendrickson audit. This entire resolution is: "In case it is found when the trust fund [made up of cash and notes received for membership fees] has been completed that there is a deficit as a result of the membership campaign that deficit may be made up from the membership fees collected from members coming in after the trust agreement has been completed."

On its face, this resolution is not clear. The testimony of Ernest Malmberg[12], who introduced the resolution, is that money had been charged to campaign expenses for entertainments which the Club members thought they should stand because beyond the campaign; and that it was the intention "that whatever the campaign expenses were over and above the agreed commission, was never to be paid by Goldie, because the money had been used for a number of things which we felt was outside of the campaign, outside of the membership campaign, and that the Club should pay for it." This testimony would justify the construction of the resolution to mean that it was intended for the benefit of Mr. Goldie and applied to any excess of campaign expenses over commissions. However, it is strange that this matter, so important to claimant, was not covered in the above contracts made eight days later (February 15, 1927), which changed the commission rate to 20%—a matter authorized by the Club by another resolution adopted at this same meeting of February 7, 1927. There are also the situations (1) that the books of the bankrupt continued to reflect these expenses as a debit against claimant, who was the managing personality of that company; and that such expenses appeared as receivables on the statement, filed in July, 1928, with the Securities Commission in connection with its application for registration of its stock, which application was executed by Mr. Malmberg as secretary of the bankrupt.

Giving claimant the fullest benefit of this resolution, it is not open to question that the resolution of the Club cannot, without more, have the slightest effect upon the contract relations between the bankrupt and claimant. Under such contracts and all of them the claimant was liable to the bankrupt for these expenses. Therefore, it was no error in bookkeeping to show such liability upon the books of the bankrupt.

As further proof that this debit entry was a mistake in bookkeeping, appellant relies upon a resolution claimed to have

---

[12] Mr. Malmberg was a lawyer.

been adopted at a directors' meeting of the bankrupt in April, 1929. The minute book of the bankrupt, as shown by the evidence and found by the referee, was last in possession of claimant. It has never been in the custody of the trustee or his counsel and has not been delivered to him although production has been "specifically" demanded by him. It was not produced at the hearing. The sole evidence of existence of such a resolution is the oral testimony of Mr. Malmberg that a resolution was adopted at a meeting in April, 1929, when he was present. He does not attempt to remember the wording of the resolution but only that its tenor was to relieve claimant from liability for this debit item. It is unusual that such a resolution as to a matter of such importance to claimant and when he was the majority stockholder and dominating personality of bankrupt was not urged for more than two years after adoption of the resolution by the Board of Governors of the Club on February 7, 1927.

However this may be, adoption of the resolution was not the legal act of the bankrupt. In April, 1929, the board of directors of the bankrupt consisted of four members. The then directors were claimant, Mr. Foote, Mr. Springer and Mr. Malmberg. Malmberg testified that Springer was not present. Whether he had been notified of the meeting does not appear.[13]

Malmberg testified positively that he had voted against the resolution. This left Mr. Foote and claimant voting for it. It took the vote of claimant to adopt it. He was directly interested adversely to the bankrupt, its stockholders and creditors. The bankrupt was then in bad financial condition. "Where the claim asserted is void or voidable because the vote of the interested director * * * helped bring it into being" it may be disallowed (Pepper v. Litton, 308 U.S. 295, 309, 60 S.Ct. 238, 246, 84 L.Ed. 281) ; and contracts of directors made with themselves "for their own benefit" will not be given effect by courts. McGourkey v. Toledo & Ohio Central Ry. Co., 146 U.S. 536, 552, 13 S.Ct. 170, 36 L. Ed. 1079; Richardson v. Green, 133 U.S. 30, 43, 10 S.Ct. 280, 33 L.Ed. 516; Wardell v. Railroad Co., 103 U.S. 651, 658, 26 L. Ed. 509. Even where a contract so obtained is merely voidable, it is so as to creditors and a trustee in bankruptcy succeeds to such rights of avoidance in the creditors. Pepper v. Litton, 308 U.S. 295, 307, 60 S.Ct. 238, 84 L.Ed. 281. This trustee is here challenging this release from liability for this debit item.

Also, the presence of the claimant, if necessary to make a quorum of the board, cannot be so counted as to matters wherein his interest is adverse to the corporation. 13 Am.Jur., p. 919 and cases in notes 10–13.[14] This record does not

---

[13] The only testimony (Malmberg) as to this is:

"Q. Now, at this directors' meeting which you say took place, whenever it was, in April, when you talked about these questions, was Mr. Springer present? A. No.

"Q. Well, how do you explain that you held a directors' meeting without Springer? A. Well, I would say that that was a combination of Goldie and Foote. Mr. Goldie was the President and could call meetings any time.

"Q. Without notice to Springer? A. Well, I don't know as to that. He may have notified Springer, but I do know this, that I was in the minority there for awhile."

[14] The necessity for such a rule of law is suggested by the *possible* situation here. There were four directors. Claimant was then (according to the testimony of Malmberg) the president and "could call meetings at any time." Mr. Springer was not present and there is no evidence that he was notified of the meeting. There were two directors' meetings in April, 1929, and the evidence, by claimant, is that Springer "could not come to the first meeting" but was present at the second meeting when the resolution was adopted. Malmberg testified Springer was not present at the meeting adopting the resolution and the referee so found. If in fact, Springer was not notified, claimant could have called a meeting of three directors (including himself) and thus constituted a quorum. In such a quorum, his vote could have been —here actually was—the deciding factor. Whereas, if Springer had been present, the vote might have been a tie, resulting in rejection of the resolution. We do not mean to say that Springer was not notified but we state a possible situation here which supports the rule of law that an interested director should not be allowed to make up a quorum of the board, at least as to the matter in which he is interested. In this connection, it is not out of place to recall that whether Springer

show what number of directors were required to constitute a quorum, however, it usually requires a majority of the directors. If this be true here, there was no legal quorum in acting on this resolution.

The contention here is solely that the debit item is a "bookkeeping error". This position is finally stated in the brief as follows:

"From the foregoing it appears that the Hendrickson debit was bookkeeping error; that no factual indebtedness on the part of Goldie to the bankrupt ever existed; that there was no discharge or attempt at discharge of any factual indebtedness but simply a rectification of a bookkeeping error."

■ We must conclude that this debit item was not improperly included in the consideration by the referee and trial court.

(5) Claim Items after January 1, 1929.

As above stated, the referee divided the claim items, for convenience in consideration, into two time periods—the first ending December 31, 1928, and the second beginning January 1, 1929. This point has to do with disallowance of the items falling in the second period. All of the items in the second period are items (Nos. 38–183) of claim 184. As to these items, the referee found:

"The supporting checks for these items are likewise included in Goldie Claim 185, Exh. B. These checks were likewise issued by Goldie, the Holding Company and the Continental Finance & Mortgage Company, to the order of the bankrupt and many other persons.

"Of the items so listed, Items 172 to 183 inclusive represent payments made after the filing of the involuntary petition herein; and of these, Items 179 to 183 inclusive, aggregating $110.00, represent payments by Goldie on a note of the bankrupt, endorsed by him as guarantor to the Midland National Bank & Trust Company of Minneapolis; no claim was ever filed upon said note in this proceeding, either by the holder of the note or by Goldie in the name of the holder.

"None of the items for this period (January first, 1929 on) appear on any books

of the bankrupt produced. Goldie has failed to establish by any satisfactory evidence that said payments were made at the request of the bankrupt, or for its use or benefit, and has failed to produce any account books reflecting such payments and has failed to disclose any payments which he may have received from the bankrupt during that period or any charges against him during that period.

"Goldie, being the president and managing officer of the bankrupt, occupied a fiduciary relation to it, and any claim presented by him against the bankrupt estate must be subjected to close and rigid scrutiny, and to be allowed, must be satisfactorily established by the proof. Such serious doubt exists as to the propriety of any of said items that the court feels constrained to disallow them. Among other things it appears that during said period Goldie came into possession of $8000 of the 'B' bonds of the bankrupt, which he included in Claim No. 184, but has failed to disclose that he gave any consideration for said bonds. It also appears that *during this period* Goldie was conducting his own business and the business of the Holding Company and Club at the same office which he maintained for the bankrupt, and with the same overhead as represented in many of these charges."

The contentions of appellant and the entire supporting argument are as follows:

"The books and records of the bankrupt comprise a journal and a ledger, for 1926 to the end of 1928, inclusive. Anyone can see, upon inspection of these, that they are more or less fragmentary and preliminary in form and nature, being just informal repositories of entries made by various persons from time to time—in essence memorandum write-ups not following a strict day-by-day chronology. Mr. Goldie has furnished the best evidence of payment—the original cancelled checks to establish his pay-outs and the debits and charges against the bankrupt for the moneys necessarily advanced in its interest and behalf. A mere comparative inspection of the checks and of the tabulation of his claims, for the two periods under which the referee considered them, dis-

was present or whether notice was given him could easily have been proven by the minute book of the bankrupt, if it were kept in usual form (this minute book was

in the possession of claimant and not produced although demanded by the trustee); or by claimant who would know whether notice had been given.

closes that the pay-outs for the second period were of the same nature and to the same end and purpose as those of the first, and were made at the request and for the benefit of the bankrupt."

The first argument seems to be an attack upon the form and completeness of the journal and ledger, introduced in evidence, covering the items in the first period. Just what this has to do with the items in this, second, period is not explained. If, from this, an unexpressed inference is intended that the account books of the bankrupt covering the second period were of similar character and, therefore, would be of little use, the answer is that the best way to have shown that would have been for the claimant to produce such books and let them speak for themselves.

The remaining argument is that the checks are the best evidence of the actual expenditures to or for the bankrupt and that a "mere comparative inspection of the checks and of the tabulations of his claims, for the two periods" discloses that those for the second period "were of the same nature and to the same end and purpose as those of the first, and were made at the request and for the benefit of the bankrupt."

We assume that the tabulations correctly show the amount, check number, check date, maker and payee of the checks representing the items of claim 184. Of the 146 items—all being checks—in this second period (aggregating $4,859.51), the tabulation for claimant shows only three (aggregating $1,070.00) where the bankrupt was payee—none is shown where bankrupt was endorsee although this is shown in the preceding part of this tabulation which related to the first period. The other 143 checks were to various persons or corporations. The earlier portion of this tabulation (relating to items in the first period) shows 37 checks of which 18 are to bankrupt (as payee or endorsee) and 19 to others (in 9 of these claimant is payee). With no other supporting evidence, we are asked to determine that these 146 items (Nos. 38—183) represent expenditures to or for the bankrupt simply from a comparison of the items in the first period with those in this period—both as shown on this tabulation. No such result can be allowed except as to the three items (aggregating $1,-070.00) where bankrupt is the payee. We

will assume that those three items in the above aggregate were received and used by the bankrupt and were beneficial to it. The other 143 items may represent, in part or wholly, expenditures for the benefit and beneficial to the bankrupt. We have no way of knowing, from this record, whether they or any of them were or were not.

But supposing that they were both expended for and beneficial to the bankrupt, that does not compel or invite the conclusion that they are allowable items against this estate. As to the first period, the referee found and the trial court approved a finding that claimed items aggregating $35,353.33 should be reduced to $156.76 because of what the account books of the bankrupt showed to be the balance in the accounts of the claimant and bankrupt. Also, one item of $1,500.00 was found to have been repaid claimant and he admits here that error. There were account books kept by the bankrupt after December 31, 1928. They were last in the possession of the claimant; have been demanded by the trustee; and not produced. Claimant was the dominating personality and majority stockholder in the bankrupt. The books of the bankrupt should have shown the transactions between it and claimant during this second period—as they did during the first period. They should have shown any credits to claimant and any debits against him so that a balance could have been struck as to this account. They would have been very strong evidence of the items in and the state of the account. Where relevant evidence is within the control of a party to whose interest it would naturally be to produce it and he fails so to do, without satisfactory explanation,° and produces no evidence or weaker evidence, an inference is justifiable that it would be unfavorable to him. Interstate Circuit, Inc., v. United States, 306 U.S. 208, 226, 59 S.Ct. 467, 83 L.Ed. 610; Local 167, International Brotherhood of Teamsters, etc., v. United States, 291 U.S. 293, 298, 54 S.Ct. 396, 78 L.Ed. 804; Mammoth Oil Co. v. United States, 275 U.S. 13, 52, 48 S.Ct. 1, 72 L.Ed. 137; United States ex rel. Bilokumsky v. Tod, 263 U.S. 149, 153, 154, 44 S.Ct. 54, 68 L. Ed. 221. This rule has been applied, by this Court, to records in possession of a party. Missouri, K. & T. Ry. Co. v. Elliott, 8 Cir., 102 F. 96, 102, affirmed 184 U.S. 695, 22 S.Ct. 937, 46 L.Ed. 763. The referee was justified in disallowing these

items in the second period because of the unfavorable inference naturally drawn from failure to produce the account books of the bankrupt.

### (6) Hennepin Transfer Company Assignment.

On June 19, 1936, Hennepin Transfer Company filed with the trustee an assignment reading as follows:

"January 3, 1935.
"Hennepin Transfer Company,
"Third Avenue North and First Street,
"Minneapolis, Minn.
"Dear Sirs:

"For value received, I hereby transfer and assign all of my right title and interest in any and all claims filed by me to this date in the bankruptcy of the Calhoun Beach Club Holding Company now recorded in the Federal Bankruptcy Court, with Alexander McCune, Referee in Bankruptcy, to you, the Hennepin Transfer Company or your [assignes]. This assignment not to exceed the sum of Three Thousand Dollars.

"Harry S. Goldie."

This was transmitted in a letter (June 18, 1936) stating the assignment was filed to protect the interests of the assignee as "we understand a dividend will soon be available to creditors." The referee found as follows:

"It appears from said books [of assignee] that as of December 31, 1938, Goldie was indebted to Shapiro or said firm in the sum of $13,618.72, and that thereafter during the year 1939 and up to the time of said hearing, said Goldie received additional advances in the amount of about $300. However, as of January 3, 1935, the date of said assignment, Goldie was indebted to Shapiro and said firm only in the amount of $2827.67, made up of an item of $1332.15 shown on Trustee's Exhibit KK and an item of $1495.52 shown on Trustee's Exhibit JJ; since that date Goldie has paid generally on his account a sum in excess thereof, to-wit: $2973.53. All of the rest of the account accrued after January 3, 1935. There being no contrary application made or directed either by Goldie or by the creditor and the account constituting a running account, the court has concluded that said payments should be applied against the first debits to extinguish them according to priority of time; therefore, Goldie's account as of the date of said assignment has been fully paid."

An assignee stands in the shoes of the assignor and subject to all equities against the assignor. Fidelity Mutual Life Ins. Co. v. Clark, 203 U.S. 64, 74, 27 S.Ct. 19, 51 L.Ed. 91; 4 Am.Jur., p. 304, § 95 and numerous cases in notes 17 and 18. Unless these claims (or at least enough of them to satisfy the assignment) can be allowed to claimant, the assignee would fare likewise. Since we hold the claims cannot be allowed, there is no point in examining this matter. Besides, the assignee has not appealed.

### (7) Subordination to Bond Claimants.

The referee found that "if the unsecured claims of Goldie should be allowed in any amount, then the claimants upon said guaranteed bonds are entitled equitably to have Goldie's claims postponed and subordinated to their rights; that it would work a fraud upon said guaranteed bondholders to permit Goldie to assert any claims in equality or in competition with them, and that therefore Goldie is estopped from sharing equally or competing with them as claimants in the distribution of the above estate."

Appellant contends that "the question of subordination and adjustment of equities should be determined, not in the order of allowance or disallowance of appellant's claims but rather in the order of distribution of assets."

It is true that equities between unsecured creditors, which may result in precedence of payments in dividends, may be determined in connection with orders of dividend payment. See In re Abell, 198 F. 484, this Court, and Keith v. Kilmer, 1 Cir., 272 F. 643. However, this does not mean that such equities or priorities cannot be determined in connection with allowance of claims of unsecured creditors. Such has often been done. Some of the cases are Carter v. Bogden, 13 F.2d 90, this Court; In re Morris Bros., 9 Cir., 293 F. 294, 297; In re Ewald & Brainard, D.C. Iowa, 135 F. 168, 171. This has been done where the precedence was based, as here, on contract obligations of the claimant affecting the equities as to other unsecured creditors. In re Bruns Co., 7 Cir., 256 F.

40; Searle v. Mechanics' Loan & Trust Co., 9 Cir., 249 F. 942. It is difficult to see why it makes any difference whether the precedence is determined in connection with allowance of a claim or in connection with payment of dividends from the estate. The essential thing is that if precedence of payment is not involved in allowance of a claim, it is not foreclosed but may be raised in connection with payment of dividends.

We do not understand that appellant challenges here the finding of the referee on the merits. Since he was guarantor on the bonds and since the property securing the bonds has been lost as such through foreclosure sale in the mechanics' lien suit, it is obvious that the postponement of claimant to such bondholders was properly determined by the referee.

The result of all the foregoing is that the order of the trial court must be and is affirmed.[15]

JOHNSEN, Circuit Judge (concurring specially).

I concur in Judge STONE'S able and painstaking opinion, except as to the portion that holds that the referee and the district court were not justified in treating Goldie's advances as the equivalent of capital contributions as against other creditors. I believe that the facts warranted such a conclusion on the part of the referee and the district court for subordination purposes, and have previously expressed similar views in the corresponding situations in Barlow v. Budge, 8 Cir., 127 F.2d 440, 445, and Boyum v. Johnson, 8 Cir., 127 F.2d 491, 494. The point is not important here in view of the general result reached, and I advert to it only as a matter of personal consistency.

WOODROUGH, Circuit Judge, concurs in the opinion of Judge JOHNSEN on this point.

---

[15] At the end of appellant's reply brief, he asks that we have sent up and consider the record in the suit on the contractor's bond. The parts of this record sought are "(1) the court files, transcript, and Mr. Deinard's brief, in the bond suit, and (2) the main brief of the appellants in the four pending appeals [our Nos. 12001, 12002, 12003, and this appeal] in the court below, the answering brief of Mr. Cox and his counsel, and the reply brief thereto." The above briefs could be no part of the record on this appeal. The files and transcript in the bond suit were not, so far as the record before us reveals, a part of the record below in this appeal. Certainly they are no part of the record brought here by the appellant. This request must be denied.